2024 UT App 32

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CAILEAN TORQUIL MACLEOD,
Appellant.

Opinion
No. 20220163-CA
Filed March 14, 2024

Third District Court, Salt Lake Department
The Honorable Amber M. Mettler
No. 201909556

Robert T. Denny, Attorney for Appellant

Sean D. Reyes and Daniel L. Day,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN D. TENNEY
concurred.

ORME, Judge:

¶1 Cailean Torquil Macleod appeals his convictions on one count each of rape and object rape and on two counts of forcible sexual abuse. In challenging his rape and object rape convictions, he argues that his trial counsel (Counsel) was ineffective for not objecting to alleged prosecutorial misconduct and inadmissible hearsay testimony. As concerns his forcible sexual abuse convictions, he contends that Counsel was ineffective for not requesting that the jury be adequately instructed on the constitutional unanimity requirement. Macleod's unanimity argument is well taken, and we therefore reverse his forcible sexual abuse convictions. But because his rape and object rape

convictions withstand his other claims of ineffective assistance, we affirm those convictions.

BACKGROUND[1]

¶2     In 2020, Macleod and Hannah[2] connected on a dating app. After a day of messaging back and forth, Hannah invited Macleod to her house. There, while lying on her bed, Macleod told Hannah "some personal stuff about him that he doesn't really share with a lot of people." Hannah then disclosed to him that she had herpes. Macleod "didn't seem to mind" and "was very understanding," so the two proceeded to have consensual sex. Afterward, Hannah told Macleod that she wanted to wait three months before having sex again because she wanted to see whether "this was going to turn into . . . an actual relationship" and because she "didn't want it to be a hook-up."

¶3     Macleod saw Hannah again at her house a few days later. They first socialized with Hannah's two roommates in the basement of her house before going upstairs to talk alone for a while. Macleod eventually became frustrated because Hannah did not want to have sex, and he went outside. There, he spoke with Hannah's male roommate (Roommate), who mentioned that Hannah had sex with another man the other day when she was drunk. Macleod then returned inside the house and told Hannah, "Oh, I just have to get you drunk to have sex with you."

¶4     The next day, Macleod met Hannah and Roommate at a grocery store. There, Macleod "kept trying to touch [Hannah's]

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

2. A pseudonym.

butt" and "to hug [her] from behind." Hannah told him "no" repeatedly, as well as "stop," and that she needed "space." Despite her protestations, Macleod was undeterred, so Hannah yelled, "Just stop touching me!" Hannah testified that "his hands did kind of touch my butt" over her clothing "but it wasn't like grabbing it." Roommate testified that he saw Macleod groping Hannah's "breasts, thighs, and sides" at the store.

¶5      After buying groceries, Hannah, Macleod, and Roommate returned to Hannah's house. There, they sat in the kitchen for about half an hour, each drinking a beer. They then went outside, where Macleod and Hannah played basketball while Roommate sat nearby, alternating between watching them and playing on his phone. Hannah testified that during the game of basketball, whenever she went to shoot, Macleod would grab her by the waist or touch her buttocks over her clothes, and at one point he touched her breasts over her clothes. Roommate testified that during the game Macleod tried to kiss Hannah and that he was groping her inner thighs and breast area. Hannah testified she repeatedly told him, "That's not how you play basketball" and that she "didn't want him to touch [her] like that." Eventually, she became very "frustrated and annoyed," so she ended the game and went to sit next to Roommate.

¶6      Hannah asked Macleod to go back into the house and retrieve another beer for her, which he did. While drinking it, Hannah began to feel tired and stated that she wanted to go inside, where they could lie down and watch a movie. She and Macleod then went to her bedroom. Hannah explained that although there were other televisions in the house, the one in her bedroom was the only one that was "plugged into . . . the cable." In her room, Hannah changed into pajamas. She was also wearing teal underwear and socks. While lying on their sides on the bed together, Macleod "tr[ied] to cuddle with" Hannah by placing one arm under her head and the other on her stomach. Hannah was "okay" with this touching.

¶7      Macleod then touched Hannah's buttocks and vagina over her clothes. She told him "to stop" and that she "just wanted to go to bed," and she moved his hand away. At first, Macleod "let it go for a little bit," but he then touched her buttocks and vagina again. Hannah again told him "no" and that she "just wanted to go to bed." Then, while Hannah was still lying on her side, Macleod pulled down her pants and inserted his fingers into her vagina. Hannah grabbed his hand and pulled it away and again said "no," "I just want to go to bed," and that she "didn't want anything to happen." Macleod did not say anything in response.

¶8      Hannah testified that she next remembered "dozing off," but she was not certain whether she fell asleep. The next thing she knew, she was lying on her stomach with her pants and underwear pulled down and Macleod was on top of her with his penis inside her vagina. Hannah told him to "get the fuck off" her, to which he said, "Don't you like that?" Hannah responded, "No. Get the fuck off me." After a few seconds, Macleod removed himself from on top of her.

¶9      Hannah then pulled up her pants and underwear, moved back onto her side, hid under the covers, and texted Roommate. She typed, "Lol your still up," "He just tried to have sex with me while I was half a sleep," and "I dont feel comfortable at all going to bed." At one point, Hannah thought Macleod had left when she heard him exit through the front door of the house, so she went into the kitchen. But Macleod quickly returned to the house to retrieve a hat he had left behind. Upon seeing Hannah, he said, "Oh, you're still awake. I was going to leave you a note telling you that I had to leave, that I didn't have my medication, and that I'm not in the right state of mind and I need to leave." Hannah replied, "[O]kay." When Macleod left for a second time, Hannah texted Roommate, "He left finally."

¶10      Roommate testified at trial that he heard Hannah shout, "Get the fuck away from me!" through the shared wall between

their bedrooms, but he remained in his room because he "was already passed out." Because he had fallen asleep, he did not see Hannah's messages until right before he left for work the next morning. Roommate testified that after work, Hannah told him about the previous night and that as she was falling asleep, "out of nowhere she felt something inside her and woke up" and that "what was inside her was [Macleod's] fingers." Roommate then stated that she told Macleod, "No. Get the fuck off me." Roommate continued, "And then a couple more minutes later, she passed out again. But this time, instead of hands, he flipped her over, pulled down her pants, and stuck his dick in" her vagina. During cross-examination by Counsel, Roommate acknowledged that although he heard Hannah shout at Macleod, he was not in the room and did not see any of this happen.

¶11    The next day—about a day and a half after the sexual assault—Hannah, accompanied by Roommate and with his encouragement, went to the hospital for an examination and to report what had happened. She brought the clothes she was wearing at the time of the assault with her. At the hospital, Hannah met with a sexual assault nurse examiner (Nurse). Nurse testified at trial that Hannah told her that while on the basketball court, Macleod "kept hugging her [and] kept trying to touch her and she kept telling him to stop," and that later in the bedroom, as Nurse recounted, "he kept trying to pull her pants off and she kept telling him to quit." Hannah told Nurse that after she fell asleep, "she woke up because she was being rolled over on her stomach and then he was penetrating her from behind." Hannah said that Macleod stopped penetrating her "shortly after" she told him to stop.

¶12    Nurse also collected some of the clothing Hannah brought to the hospital, including the teal underwear, and swabbed Hannah's breasts, neck, fingernails, mouth, "pubis to anus," and "vaginal vault." Subsequent DNA testing revealed male DNA in her vagina, but of an insufficient quantity to allow for further

testing. DNA testing of the teal underwear revealed "touch DNA"[3] belonging to Macleod and seminal fluid belonging to the other man Hannah had sex with a few days earlier.

¶13   A police officer (Officer) also spoke with Hannah at the hospital. Officer testified at trial that when he first saw Hannah in the hospital room, she was sitting on the hospital bed "in a fetal position" with her arms wrapped around her legs. She appeared to him as though she had been crying, and she was "very jittery, tense, on edge" with "[p]retty frantic eye movement." Officer testified that Hannah told him that while playing basketball, Macleod "kept trying to grab her . . . private areas: Buttocks, thighs, breasts, vagina area," and that Hannah kept having to push him away and tell him, "No . . . don't touch me. I don't want that." Officer testified that Hannah told him that later that evening, she and Macleod watched a movie in her bedroom and she eventually fell asleep. At approximately 3:00 a.m., Hannah said, she woke up "with her pants down and she was being penetrated by" Macleod. She told Officer that Macleod's "fingers and his penis had entered her vagina." Officer understood Hannah to mean that both forms of penetration occurred at "[a]pproximately" the same time. Hannah told Officer that she told Macleod "to get off" her, which he did, and that Macleod then asked her "if they were okay, if everything was fine, and then left her home."

¶14   A few days later, a detective (Detective) interviewed Macleod. At trial, Detective testified that Macleod gave the

---

3. At trial, one of the State's expert witnesses explained that "touch DNA" is "any potential DNA left behind from touching. Just skin contact really." The expert also explained that the difference between touch DNA and bodily fluid DNA is that the latter yields more DNA.

following version of events during the interview.[4] Macleod told Detective that he met Hannah on a dating app and that when they met in person, Hannah disclosed to him that she had herpes and they had consensual sex. After they had sex, she told him that she wanted to wait three months to have sex again because "she didn't want the relationship based on sex." The second time they met, "there was no sexual contact," although Hannah "was touchy." At that second meeting, Macleod was aware that Hannah had sex with another man.

¶15 The third time they met, he, Hannah, and Roommate were at the grocery store. According to Macleod, nothing of note happened at the store. They then went back to Hannah's house, where he and Hannah played basketball, during which he hugged her around the waist, but he stated that "he didn't touch any of her parts, that it was just a normal hug." Hannah then told him that "basketball is a no contact sport."

¶16 Macleod told Detective that afterward, he suggested they go inside to watch a movie. While on Hannah's bed cuddling, Macleod "made a move" on Hannah and they started kissing. He then "tugged at her pants and she told him no and moved his hand away." Macleod denied both that "his hand ever went down her pants" and that "his fingers ever went in her vagina." Macleod told Detective that "he respected" Hannah's request "and stopped touching her and they just cuddled" until she fell asleep. Macleod said he then kissed her neck and "tried to make another move." They "kissed passionately" but Hannah told him, "Remember what I told you earlier." When Detective asked Macleod to clarify what Hannah meant by that statement, Macleod said "that meant that she didn't want to go any further."

---

4. A recording of this interview was submitted into evidence as an exhibit at trial, but the State played only a few minutes of the hour-long interview for the jury as part of its cross-examination of Macleod. *See infra* ¶ 24.

Macleod stated that he then "stopped and that was the end of their passionate kissing."

¶17     Macleod stated that once Hannah fell back asleep, he began to feel anxious because he had not taken his medication, so he left. But he soon returned to retrieve his hat and found Hannah sitting in the kitchen. Because he "felt bad like he was sneaking out in the middle of the night," he apologized for leaving after kissing her. He then asked Hannah out on another date, to which she agreed, and he left.

¶18     Detective testified that Macleod told her that he and Hannah "were no longer together" because "they just didn't seem like a good fit" and that he was seeing someone else. He explained that he and Hannah had "different political views" and that "they got in a very heated discussion" on the subject during their third meeting. Despite not "feeling it" after the argument, Macleod said he still wanted to have sex with her that night.

¶19     The State charged Macleod with one count each of rape and object rape and two counts of forcible sexual abuse. At trial, as part of its case-in-chief, the State presented testimony from Hannah, Roommate, Officer, Nurse, and expert witnesses. This testimony is recounted above.

¶20     Macleod testified in his defense. He stated that Hannah was wearing teal underwear when they had consensual sex during their first meeting. And after they had sex, she told him that she did not want to have sex again for another three months to "set the basis for a serious relationship." But Macleod testified that during their second meeting, Hannah told him that she had "sex approximately six times" the previous night with another man. Upon hearing this, Macleod did not believe that they "could have a serious relationship" anymore, and he expected to have only a "[p]urely casual" relationship going forward.

¶21   He testified that when he met her and Roommate at the grocery store the next day, he and Hannah had "an established casual relationship" and any touching that occurred there was "casual." He stated that Hannah never asked him to stop touching her or yelled at him in the grocery store. And when they later played basketball at her house, although Macleod acknowledged that there was contact between them and that Hannah told him that "[b]asketball is a no contact sport," he stated that he "did not inherently do anything sexual to her at all." He stated that he believed the only reason she wanted "a physical barrier" between them was that she did not want Roommate "to feel awkward."

¶22   He stated that once the game ended, he asked Hannah if she wanted "to watch a movie and cuddle." She responded, "Yeah, that sounds nice." He stated that while cuddling on her bed, they started to kiss and he "proceeded to try and go further" but Hannah stopped him, saying, "Remember, I wanted to wait." Macleod testified that Hannah then explained that she wanted to wait not only because of their relationship but also because "she had an incurable lifelong . . . sexually transmitted disease." Macleod stated that at that point the relationship was already casual, but "now I find out that in said casual relationship I could contract something that would stay with me for life." He thus decided that "there is nothing there" between them and that when he later left Hannah's house, he considered their casual relationship "[t]o be terminated." He denied inserting his penis or fingers into her vagina that night. He also denied groping her breasts or buttocks.

¶23   During cross-examination by the State, Macleod denied touching Hannah's buttocks at the grocery store, but he stated he "might have" touched Hannah's waist and that he did not "believe" he touched her breasts. He also stated that when Hannah later told him on the basketball court that "[b]asketball is a no-contact sport," she did so "[j]okingly," "in a very

light-hearted manner." He also stated that they were playing a game of HORSE.[5]

¶24 The State played portions of Detective's recorded interview with Macleod as part of its cross-examination. These points are noteworthy:

- Macleod told Detective that Hannah disclosed to him that she had herpes on their first meeting, which contradicted Macleod's claim at trial that she told him about it for the first time during their third meeting. Macleod explained the discrepancy by stating that the interview "was confusing" and "there were multiple points in which [Detective] asked me to clarify things that I thought I had said." The State, however, pointed out that this statement was made four minutes into the interview and asked whether he was "already confused at that point." Macleod replied, "I'm not sure how to answer the question."

- Macleod told Detective that he and Hannah ended their relationship over political differences, but at trial he stated that he ended the relationship because Hannah told him she had herpes. Macleod testified that he did not mention herpes during the interview as a reason for ending their

---

5. Macleod described the rules of the game as follows: "One person lines up and takes a shot, the next person, if that shot is made, has to make that same shot." He also acknowledged that "there is no defense involved" in a game of HORSE. *See How to Play Horse (the Basketball Game)*, WikiHow, https://www.wikihow.com/Play-Horse-(the-Basketball-Game) [https://perma.cc/NQK4-QYPF] ("[HORSE] is a basketball shooting game where players take turns shooting at the hoop from different locations. If someone makes a shot but everyone else misses, those people get a letter toward the word 'HORSE.' The last person left standing wins!").

relationship because he "tried not to make it a focal point," although he acknowledged that he mentioned it several times at other points during the interview.[6]

• Macleod told Detective that he would have had sex with Hannah that night if she had consented, but at trial he said he no longer wanted even a casual relationship with her after finding out about her having herpes. Macleod testified that he "was not trying to focus on that aspect," referring to her herpes, during the interview.

¶25   During closing argument, the State told the jury, in relevant part, that the count of rape corresponded to the allegation that Macleod inserted his penis into Hannah's vagina and the count of object rape corresponded to the allegation that he inserted his fingers into her vagina. Concerning the two counts of forcible sexual abuse, the State told the jury,

> Count 3 and 4 are the same elements but for different actions. The defendant touched [Hannah's] breast and touched her buttocks without her consent. This occurred on the basketball court. [Hannah] and [Roommate] described the defendant repeatedly touching and groping [Hannah's] bottom, specifically her breasts and buttocks. He did so just by being told to stop in the store and then being told to stop again while playing basketball.

¶26   The State also highlighted the discrepancy between what Macleod told Detective and his trial testimony concerning when

---

6. In Part I below, we provide an excerpt of this portion of the cross-examination and also provide a transcription of a portion of the recorded interview that was not played for the jury in which Macleod mentioned Hannah's herpes and the other man with whom she was having sex as reasons for their relationship ending.

Hannah disclosed to him that she had herpes and why he left the house on the night in question, stating,

> The defendant says that on the night [Hannah] told him about the herpes, that made him leave, but exactly none of that is in his interview. The exact opposite is. He says he touched her, he pulled on her pants, and she said no. He kissed her while she was asleep, she woke up and said no. He said he then waited . . . for her to sleep again and then he left.
>
> He said he was anxious because he hadn't taken his medications and so he leaves and he tells [Hannah] this. And he told [Detective] that that was why he left. Today he says this was an excuse he made up to get out of an uncomfortable situation with [Hannah], but that is not what he told [Detective], that it's really about the herpes, that it's really about this other sexual partner that [Hannah] is having.

¶27   Counsel stated during closing argument that Macleod "categorically denied having any sexual intercourse" that night, including inserting his fingers into Hannah's vagina or groping her breasts, buttocks, inner thighs, or vagina. Counsel asserted that when Hannah told Macleod about her herpes on the night of their third meeting, he realized he no longer wanted to have even casual sex with her, so he left. Counsel then suggested that after Macleod left, Hannah and Roommate "had 36 hours to concoct a story about being scorned and" to "alleg[e] particular things to have happened." In support of this theory, Counsel rhetorically asked what kind of roommate would go to sleep after hearing Hannah yell, "Get the fuck off me!" He also suggested that Macleod's touch DNA appeared on Hannah's underwear because the pair she brought to the hospital was the pair she had worn when they had consensual sex on their first

meeting and not the pair she wore on the night of the alleged sexual assault.

¶28 The jury convicted Macleod on all charges. This appeal followed.

ISSUES AND STANDARD OF REVIEW

¶29 Macleod raises three claims of ineffective assistance of counsel that we reach on the merits. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Elkface*, 2023 UT App 24, ¶ 7, 527 P.3d 820 (quotation simplified), *cert. denied*, 534 P.3d 752 (Utah 2023).

ANALYSIS

¶30 A successful ineffective assistance of counsel claim requires a criminal defendant to show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel[.]" *State v. Hatch*, 2019 UT App 203, ¶ 29, 455 P.3d 1103 (quotation simplified), *cert. denied*, 462 P.3d 801 (Utah 2020).

¶31 Under the first element, defense counsel's acts or omissions amount to deficient performance when they fall "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. When conducting this analysis, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. *See id.* ("Judicial scrutiny of counsel's performance must be highly deferential."). It is thus insufficient to merely show that counsel erred. *See State v.*

*Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 ("Even if an omission is inadvertent and not due to a purposeful strategy, relief is not automatic.") (quotation simplified). Rather, "the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

¶32 Under the second element, to establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In conducting this inquiry, "an appellate court should consider the totality of the evidence, taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly the verdict is supported by the record." *Gregg v. State*, 2012 UT 32, ¶ 21, 279 P.3d 396 (quotation simplified).

¶33 Macleod argues that Counsel was ineffective for (1) not objecting to statements that amounted to prosecutorial misconduct, (2) not objecting to inadmissible hearsay evidence, and (3) not requesting more detailed unanimity instructions.[7] The first two claims relate to his rape and object rape convictions, while the third claim relates to his two forcible sexual abuse convictions. We address each argument in turn.

---

7. Macleod raises a fourth claim that Counsel was ineffective for not requesting "lesser included [jury] instructions for the two charges of forcible sexual abuse." Because we reverse both forcible sexual abuse convictions on jury unanimity grounds, *see infra* Part III, we need not also address this challenge to those convictions.

## I. Prosecutorial Misconduct

¶34   Macleod contends that the prosecutor[8] committed prosecutorial misconduct "by misrepresenting evidence critical to his defense on the rape and object rape charges." He asserts that his defense to those charges was that he did not have sex with Hannah on the night in question "because (1) she had herpes and (2) she was having sex with another man," but that the prosecutor improperly undermined this defense by twice incorrectly claiming that during Macleod's interview with Detective he made no mention of herpes as a reason for the relationship ending.

¶35   The first instance of alleged prosecutorial misconduct occurred during Macleod's cross-examination, when the following exchange took place:

> [Prosecutor]: And your position today is that the reason that the relationship ended is because there was nothing left in it for you, as far as a casual relationship because you could catch herpes; right?
>
> [Macleod]: Correct.
>
> [Prosecutor]: But that's not what you told [Detective], that's something you're saying for the first time today; isn't it?
>
> [Macleod]: Not for the first time. I've told my lawyer multiple occasions.
>
> [Prosecutor]: I'm sure you have. So the first time that we are hearing about it is today; is that right?

---

8. Although there were two prosecutors at trial, for simplicity we refer to them in the singular.

[Macleod]: I—I'm—again, 16 months ago. I don't know exactly what this is said so I can't, yeah.

[Prosecutor]: But you did mention reasons for your relationship ending with [Hannah] to [Detective]?

[Macleod]: I did.

[Prosecutor]: And you didn't bother to include herpes as one of those reasons.

[Macleod]: Apparently I brought it up.

[Prosecutor]: You brought it up but not in that context; right?

[Macleod]: I tried not to make it a focal point. I didn't want [Detective] to believe that I was trying to shame her in any way. . . .

¶36    The second instance of alleged prosecutorial misconduct occurred when the prosecutor stated during closing argument, "Today [Macleod] says [the medication] was an excuse he made up to get out of an uncomfortable situation with [Hannah], but that is not what he told [Detective], that it's really about the herpes, that it's really about this other sexual partner that [Hannah] is having."

¶37    Macleod contends that these representations by the prosecutor that Macleod did not mention herpes as a reason for the relationship ending is refuted by a portion of the recorded interview that was not played for the jury. Specifically, the prosecutor stopped playing the recording immediately after Macleod told Detective,

So the first night like I don't know we talked about—we talked about like, pasts and got to know

each other a little bit. And we ended up sleeping together. And then in—and then, actually, she told me that she had herpes. And then that was kind of weird.

But if the recording had continued playing, the jury would have heard Macleod stating some 30 seconds later, with our emphasis,

Regardless of any views or anything like that, so. That was the only time we had sex. *It was—well, and it was partially too like, one, she had herpes* and I just—I don't know. I wasn't really—I'm not trying to, you know, get ahead of myself in that department. And, you know, we had talked about if we were going to see other people or not. And she said that—*I think it was the second time I came over. She like told me she was still seeing this guy.* He's a rapper, I don't know. And they were having sex a lot and so—I don't know. I mean, that kind of made me pull away a little bit too. I mean, that's—I mean, that's about it.

¶38 Based on this excerpt from the interview with Detective, Macleod asserts that he did, in fact, identify herpes and Hannah's sexual relationship with the other man as reasons for the relationship ending. He therefore argues that Counsel's failure to object to the prosecutor's claims to the contrary "left the prosecution's misrepresentations unscathed, likely leaving the jury with the impression that [his] sexual health-based defense was fabricated." And he argues that "[b]ecause the charges of rape and object rape turned on the jury's assessment of [Hannah's] and [his] credibility, failing to remedy the prosecutor's misstatements was objectively unreasonable." But even assuming, without deciding, that the comments to which

Macleod points amounted to prosecutorial misconduct,[9] Counsel nonetheless did not perform deficiently by not objecting.

¶39    "If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show [deficient] performance." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871. *See id.* ¶ 32 ("We must view a decision to not object in context and determine whether correcting the error was sufficiently important under the circumstances that failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought."). And here, we can readily conceive of a strategic reason why Counsel would have foregone an objection both during Macleod's cross-examination and during closing argument. Namely, Counsel could have decided not to object to avoid prompting the prosecutor, particularly during closing argument, to highlight other arguably more glaring issues with the defense's claim that Macleod did not wish to have sex with Hannah on the night of the alleged assault due to his discovery that she had herpes and a sexual relationship with another man.

¶40    Although Macleod's statement in the interview is somewhat ambiguous as to whether Hannah told him that she had herpes before or after they had sex, Macleod told Detective that the disclosure took place during their first meeting. This contradicted Macleod's trial testimony that Hannah told him on the third night, which caused him to no longer wish to have even a casual sexual relationship with her going forward—his

---

9. The State argues that the prosecutor's comments "fairly characterized the evidence" because although "Macleod may have mentioned once in [the] interview that herpes was *one* possible reason for ending his relationship with Hannah," he placed greater emphasis on their political differences and that they were not "a good match," and he "did not make [herpes] his entire defense [during the interview] like he did at trial."

discovery during their second meeting that she had had sex with another man already having caused him to abandon any intention of pursuing a serious relationship with her. If she told him about the herpes on the first night, the fact that he met with her two more times undercuts his health-based claim that he was no longer interested in a sexual relationship with her following the disclosure. In any event, regardless of what day Hannah made the disclosure, Macleod also told Detective that he would have had sex with her that night if she had consented, which is completely at odds with his claim that he was no longer interested in having sex with her after he found out about her herpes.

¶41    These blatant contradictions arguably undercut Macleod's health-based defense more than the alleged prosecutorial misconduct because Macleod was able to somewhat explain his failure to name herpes and the other man as reasons for the relationship ending by stating that he did not wish to appear to be "sham[ing]" Hannah "in any way." Although he did mention herpes in other contexts during the interview, a reasonable jury could accept this explanation. But Macleod's justifications for the other contradictions were much weaker. Macleod stated that he told Detective that he found out about the herpes on the first date, when it was actually the third date because the interview was "confusing." But the prosecutor quickly rebutted this claim by pointing out that he made the statement only four minutes into the interview and asking whether the interview had already become confusing at that point, to which Macleod responded, "I'm not sure how to answer the question." Additionally, Macleod's assertion that he told Detective that he was willing to have sex with Hannah that night because he "was trying not to focus on" Hannah's herpes makes less sense in that context than when he used the same explanation for not naming herpes as a reason for the relationship ending.

¶42    In light of all this, Counsel could have reasonably decided to forego objecting to the two instances of alleged prosecutorial

misconduct so as not to cause the prosecutor to place even greater emphasis on the above-mentioned contradictions. Accordingly, Counsel did not perform deficiently when he did not object to either instance of alleged prosecutorial misconduct, and Macleod's claim of ineffective assistance therefore fails.

## II. Hearsay

¶43 Hearsay is a "statement that . . . the declarant does not make while testifying at the current trial or hearing" and that "a party offers in evidence to prove the truth of the matter asserted in the statement." Utah R. Evid. 801(c). Unless otherwise authorized by the Utah Rules of Evidence or by statute, hearsay statements are inadmissible at trial. *See id.* R. 802.

¶44 Macleod argues that Counsel was ineffective for not objecting on hearsay grounds to portions of Roommate's and Officer's testimonies regarding what Hannah told them transpired in her bedroom. He asserts that by not objecting, Counsel "provided the State an opportunity to prove their case through two additional witnesses." We hold that Counsel was not ineffective in either instance.

A. Roommate's Testimony

¶45 At trial, Roommate testified that Hannah told him that while she and Macleod were alone in her bedroom, "she was falling asleep and then out of nowhere she felt something inside her and woke up" and that "what was inside her was [Macleod's] fingers." Roommate further testified, "And then a couple more minutes later, she passed out again. But this time, instead of hands, he flipped her over, pulled down her pants, and stuck his" penis into her vagina.

¶46   Macleod argues that Counsel was ineffective for not objecting to this inadmissible hearsay testimony.[10] But because Counsel could have elected to forego an objection for a reasonable strategic purpose, Counsel did not perform deficiently, so this claim of ineffective assistance of counsel necessarily fails. *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 ("If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show [deficient] performance.").

¶47   As part of his trial defense, Macleod claimed that Hannah and Roommate fabricated the allegations against him. In support of this theory, Counsel highlighted during closing argument the fact that Hannah did not go to the hospital for approximately 36 hours after the alleged rape and object rape occurred, during which time, he asserted, she and Roommate "concoct[ed]" their story. In support of this fabrication defense, Counsel suggested that the pair of teal underwear Hannah brought to the hospital was the pair she wore on the day of the first meeting when she and Macleod had consensual sex—it was not the pair she actually wore on the night of the sexual assault. Counsel also cast doubt on Roommate's credibility and further promoted the fabrication defense by pointing to Roommate's counterintuitive response of simply going to sleep after hearing Hannah shout at Macleod to get off her. Counsel then rhetorically asked, "What roommate does that?" Presumably, if Macleod had caused Hannah to yell such a thing loud enough for Roommate to hear it through the wall, Roommate would have checked to see if Hannah needed help or, at the very least, stayed up a bit longer to monitor the situation. *See also infra* ¶ 55.

¶48   Counsel's cross-examination of Roommate's account of the rape and object rape also advanced the defense's fabrication

---

10. The State does not contend that this testimony was admissible under an exception to the hearsay rule.

theory. Namely, during cross, Roommate acknowledged that his testimony regarding the rape and object rape was entirely based on what Hannah told him and that he was not present and did not personally witness what he was alleging occurred in the bedroom. Roommate testifying to things he had no personal knowledge of, and that he could not possibly know without speaking with Hannah, thus arguably supported the defense's assertion that the two colluded to get their stories straight.

¶49    For this reason, because Counsel could have reasonably decided to cross-examine Roommate regarding his hearsay testimony rather than object to it, Counsel did not perform deficiently by not objecting to Roommate's testimony.

B.    Officer's Testimony

¶50    At trial, the State asked Officer to recount what Hannah told him at the hospital. Officer answered that she told him she had fallen asleep while watching a movie with Macleod in her bedroom and that "approximately at 3:00 in the morning, she had woken up with her pants down and she was being penetrated by [Macleod]. She told him to get off. He got off her, asked if they were okay, if everything was fine, and then left her home."[11] Shortly afterward, Officer added that Hannah told him that Macleod's "fingers and his penis had entered her vagina." During cross-examination by Counsel, Officer stated he believed Hannah told him that both forms of penetration occurred at "[a]pproximately" the same time.

---

11. Officer also testified that Hannah told him that Macleod touched her "[b]uttocks, thighs, breasts, [and] vagina area" on the basketball court. But because this testimony went toward the forcible sexual abuse convictions, which we reverse on unanimity grounds, *see infra* Part III, we do not discuss Macleod's challenge to that portion of Officer's testimony here.

¶51 Macleod claims that Counsel was ineffective for not objecting to this testimony on hearsay grounds. But even assuming, without deciding, that this portion of Officer's testimony was inadmissible hearsay and that Counsel's failure to object amounted to deficient performance,[12] this claim of ineffective assistance nonetheless fails for lack of prejudice. *See State v. Hatch*, 2019 UT App 203, ¶ 29, 455 P.3d 1103 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice that course should be followed.") (quotation simplified), *cert. denied*, 462 P.3d 801 (Utah 2020).

¶52 In arguing that Counsel's failure to object was prejudicial, Macleod asserts that Hannah's testimony was the only direct evidence of rape and object rape and thus that Officer's corroboration of her allegations likely affected the outcome of the case to Macleod's detriment. *See State v. Burnett*, 2018 UT App 80, ¶ 39, 427 P.3d 288 (stating that cases in which there are "no confession, no third-party eyewitnesses, and no physical evidence" and in which "the only direct evidence that abuse occurred [is the alleged victim's] testimony" are cases that are "not strongly supported by the record") (quotation simplified), *cert. denied*, 432 P.3d 1232 (Utah 2018). But Macleod's convictions on these two counts were not as weakly supported by the record as Macleod asserts. Hannah's contemporaneous text message to Roommate stating that Macleod "just tried to have sex with me while I was half a sleep" and Macleod's touch DNA on the teal underwear corroborate her allegations to some degree. Although Hannah's message did not specify that Macleod inserted his fingers and penis into her vagina, they supported Hannah's

---

12. The State argues that Counsel could have reasonably concluded that Officer's "testimony about what Hannah told him at the hospital about the rape and object rape was not hearsay because it was necessary to explain his sex offense investigation." Because we decide this issue on prejudice grounds, we do not address this argument.

account that Macleod made some sort of unwanted sexual advance—which could include the alleged rape and object rape—and refuted Macleod's testimony that he was not interested in having sex with her that night. Additionally, the touch DNA on the teal underwear is physical evidence that some part of Macleod's body came, at the very least, in very close proximity to Hannah's vagina.

¶53    In any event, Officer's testimony was merely cumulative of Hannah's testimony. "When testimony is merely cumulative," "we are usually disinclined to find prejudice even when the testimony was improperly admitted." *State v. Samples*, 2022 UT App 125, ¶ 74, 521 P.3d 526 (quotation simplified), *cert. denied*, 525 P.3d 1279 (Utah 2023). This is because such testimony does not typically "offer anything new or additional to the evidentiary picture." *Id.* (quotation simplified). Although there are conceivably situations in which the mere repetition of testimony could prejudice a defendant, *see id.* ¶ 75, such is not the case here for several reasons.

¶54    First, Officer's account was less detailed than Hannah's. *See id.* ¶ 76. Hannah testified that while she was lying on her side in bed with Macleod, Macleod pulled down her pants and inserted his fingers into her vagina. After rebuking him, she "doz[ed] off," only to be woken up to find herself lying on her stomach, her pants pulled down, and Macleod on top of her with his penis inside her vagina. Officer, on the other hand, recounted only the penetration that occurred after Hannah had fallen asleep. Although Officer later stated that Macleod penetrated Hannah both with his fingers and penis, the only penetration that he detailed occurred after Hannah had fallen asleep.

¶55    This leads us to our second point. Because certain parts of Officer's testimony were at odds with Hannah's testimony, it may well have helped the defense. *See id.* ¶ 78. Officer stated that from speaking with Hannah, it was his understanding that both forms

of penetration occurred at "[a]pproximately" the same time. Indeed, he testified that Hannah was penetrated only after she fell asleep. But Hannah testified that the digital penetration occurred while she was still awake and that the penile penetration occurred after she had fallen into a more sleep-like state. This conflict may well have helped bolster the defense's fabrication theory, which is discussed in more detail in Part II.A above. That is, a jury could reasonably infer from this discrepancy that Hannah told Officer one story but later changed it.

¶56 Finally, the jury heard similar testimony from Nurse. Nurse testified that Hannah told her during the examination that after she fell asleep, "she woke up because she was being rolled over on her stomach and then he was penetrating her from behind." Because Nurse's testimony was unchallenged both at trial and on appeal, Officer's testimony was also "merely cumulative of other evidence that [Macleod] has not challenged." *State v. Verde*, 770 P.2d 116, 119 (Utah 1989). *See RJW Media Inc. v. Heath*, 2017 UT App 34, ¶ 38, 392 P.3d 956 (stating that in light of other unchallenged evidence containing "the same information" as the challenged testimony, the appellant "cannot show that it was prejudiced by [the] cumulative testimony"). *Cf. State v. Miranda*, 2017 UT App 203, ¶ 47, 407 P.3d 1033 ("[W]hen erroneously admitted evidence is cumulative of evidence already before the factfinder, the error may be considered harmless."), *cert. denied*, 417 P.3d 581 (Utah 2018). Thus, in light of Nurse's similar testimony, a successful objection to Officer's hearsay testimony would not have prevented the negative impact to the defense Macleod claims on appeal to have suffered.

¶57 For these reasons, we are not convinced that Officer's "brief recitation of certain portions of [Hannah's] testimony would have persuaded the jury to give her testimony any more or less credence." *Samples*, 2022 UT App 125, ¶ 81. We therefore hold that any error on Counsel's part for not objecting to Officer's

alleged hearsay testimony was not prejudicial, and this claim of ineffective assistance fails.

### III. Unanimity Instruction

¶58 Macleod argues that Counsel was ineffective for not requesting that the jury be fully instructed on unanimity for the two forcible sexual abuse charges.[13] We agree.

¶59 The Utah Constitution directs that "[i]n criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10. To satisfy this constitutional requirement, it is insufficient for a jury to unanimously find "only that a defendant is guilty *of a crime*" and render "a generic 'guilty' verdict that does not differentiate among various charges." *State v. Hummel*, 2017 UT 19, ¶ 26, 393 P.3d 314 (emphasis in original; quotation otherwise simplified). Rather, it "is well-established in our law" that a jury must be unanimous "as to a specific crime" and "on all elements of a criminal charge." *Id.* ¶¶ 28–30 (quotation simplified). For example, a verdict would not be unanimous "if some jurors found a defendant guilty of a robbery committed on December 25, 1990, in Salt Lake City, but other jurors found him guilty of a robbery committed January 15, 1991, in Denver, Colorado, even though . . . all the jurors together agreed that he was guilty of some robbery." *State v. Saunders*, 1999 UT 59, ¶ 60, 992 P.2d 951.

¶60 Thus, where evidence is presented that the defendant committed more distinct criminal acts than what the defendant was charged with, "the jury must be unanimous as to which act or incident constitutes the charged crime." *State v. Case*, 2020 UT App 81, ¶ 21, 467 P.3d 893 (quotation simplified), *cert. denied*, 474

---

13. Macleod also argues that the trial court plainly erred by failing to properly instruct the jury on unanimity. Because we reverse both of his forcible sexual abuse convictions on ineffective assistance of counsel grounds, we need not address this additional argument.

P.3d 948 (Utah 2020). "[T]o ensure unanimity in such multiple-acts cases, the jury instructions must either (1) link an alleged criminal act to a charge or (2) inform the jury that it must unanimously agree that the same alleged criminal act has been proven beyond a reasonable doubt." *State v. Gollaher*, 2020 UT App 131, ¶ 32, 474 P.3d 1018, *cert. denied*, 481 P.3d 1040 (Utah 2021). Such instruction is "critical to ensuring unanimity." *State v. Alires*, 2019 UT App 206, ¶ 23, 455 P.3d 636, *cert. denied*, 466 P.3d 1076 (Utah 2020). Otherwise, "the jurors could have completely disagreed on which acts occurred or which acts were illegal," *id.*, "thereby effectively lowering the State's burden of proof at trial," *State v. Granere*, 2024 UT App 1, ¶ 38, *petition for cert. filed*, Feb. 12, 2024 (No. 20240134). *See Alires*, 2019 UT App 206, ¶ 25.

¶61 Here, the State charged Macleod with two counts of forcible sexual abuse. Under the relevant elements of the crime,

> an actor commits forcible sexual abuse if . . . without the consent of the individual, the actor:
>
> (A) touches the anus, buttocks, pubic area, or any part of the genitals of another individual;
>
> (B) touches the breast of another individual who is female; or
>
> (C) otherwise takes indecent liberties with another individual[.]

Utah Code Ann. § 76-5-404(2) (LexisNexis Supp. 2023). Notably, "each unlawful touch of an enumerated body part (or each unlawful taking of indecent liberties) constitutes a separate offense of" forcible sexual abuse. *Alires*, 2019 UT App 206, ¶ 21.[14]

---

14. In *State v. Alires*, 2019 UT App 206, 455 P.3d 636, *cert. denied*, 466 P.3d 1076 (Utah 2020), this court was specifically discussing

(continued…)

In other words, the forcible sexual abuse statute "contains alternative *actus reus* elements by which a person could be found guilty of sexual abuse." *Id.* (quotation simplified).

¶62 The verdict form in this case specified that one count of forcible sexual abuse was for illegal "touching of the breast," and the second was for illegal "touching of the buttocks." But between Hannah's and Roommate's testimonies, the jury heard testimony that Macleod touched Hannah's breasts and buttocks without her consent at the grocery store (breasts and buttocks), on the basketball court (breasts and buttocks), and in Hannah's bedroom (buttocks). Thus, the jury heard more than one allegation that could satisfy each count.

¶63 Additionally, the jury instructions were insufficient to satisfy the constitutional unanimity requirement for the two forcible sexual abuse counts. Jury Instruction 34 stated, in relevant part, "Open discussion should help you reach a unanimous agreement on a verdict"; "Try to reach unanimous agreement, but only if you can do so honestly and in good conscience"; and "Because this is a criminal case, every single juror must agree with the verdict before the Defendant can be found 'guilty' or 'not guilty.'" Jury Instruction 35 also referenced unanimity, stating, "Once the jury has reached a unanimous verdict, the foreperson is responsible for filling out and signing the verdict form on behalf of the entire jury," and "The foreperson will fill in the appropriate blank [on the verdict form] to reflect the jury's unanimous decision." None of these instructions specifically "link[ed] an alleged criminal act to a charge" or "inform[ed] the jury that it

_____

the sexual abuse of a child statute. But other than additionally requiring nonconsent, the relevant elements of the forcible sexual abuse statute are identical to that of the sexual abuse of a child statute. *Compare* Utah Code Ann. § 76-5-404.1(2) (LexisNexis Supp. 2023) (sexual abuse of a child), *with id.* § 76-5-404(2) (forcible sexual abuse).

must unanimously agree that the same alleged criminal act has been proven beyond a reasonable doubt," *Gollaher*, 2020 UT App 131, ¶ 32, which was "critical to ensuring unanimity," *Alires*, 2019 UT App 206, ¶ 23. "And this court has repeatedly held that failure to request a proper unanimity instruction constitutes deficient performance." *Granere*, 2024 UT App 1, ¶ 38. *See, e.g., id.*; *State v. Garcia-Lorenzo*, 2022 UT App 101, ¶ 40, 517 P.3d 424, *cert. granted*, 525 P.3d 1263 (Utah 2022); *State v. Baugh*, 2022 UT App 3, ¶ 19, 504 P.3d 171, *cert. granted*, 525 P.3d 1257 (Utah 2022); *Alires*, 2019 UT App 206, ¶¶ 24–25.

¶64 The State argues that "competent counsel could reasonably conclude that a request for additional instructions was unnecessary here because the prosecutor elected to tie specific acts to each specific charge in closing argument." But this argument relies on the assumption that the prosecutor "cured" any inadequacy in the jury instructions during closing argument. Our Supreme Court recently held that counsel may reasonably "rely on the State's *clear identification*" of the sole alleged act that a jury may consider as the basis for conviction on a certain count in lieu of requesting additional unanimity instructions. *State v. Paule*, 2024 UT 2, ¶ 82 (emphasis added). Alternatively, the Court held that reasonable counsel may forego seeking specific unanimity instructions to avoid "broaden[ing] the State's arguments against [the defendant] to his detriment." *Id.* ¶ 74. Put differently, reasonable counsel could conclude that the State elected to put all its eggs in one basket and that the introduction of proper unanimity instructions could prompt the State to introduce alternative alleged acts for the jury to consider as a basis for conviction. *See id.* ¶ 76. But this is not the case here. As discussed in greater detail below, the prosecutor's closing argument did not clearly identify for the jury which alleged touch it was limited to considering for each of the forcible sexual abuse counts. Accordingly, Counsel performed deficiently in failing to request that the jury receive sufficient unanimity instructions.

¶65  We next turn to whether that deficient performance prejudiced Macleod. "[W]e have rejected ineffective assistance claims on prejudice grounds in two types of jury unanimity cases." *Garcia-Lorenzo*, 2022 UT App 101, ¶ 49. The first instance is when "we have concluded that the State made clear, in closing argument or elsewhere, which act went with each count, and therefore a specific instruction on jury unanimity would not have changed the outcome of the case." *Id.* The second instance is when "we have concluded that, for various case-specific reasons, the outcome of the case would not have changed had the jury been given a specific jury unanimity instruction." *Id.* ¶ 50.

¶66  Our main focus is on whether the instant appeal falls under the first set of cases, i.e., whether the State's closing argument mitigated the prejudicial effect of Counsel's failure to request a proper unanimity instruction. Although the State may alleviate the prejudice caused by insufficient unanimity instructions by providing such guidance "in closing argument or elsewhere," *see id.* ¶ 49, it must do so by "*clearly* identif[ying] for the jury which factual circumstance formed the basis for [the] charge," *State v. Paule*, 2021 UT App 120, ¶ 48, 502 P.3d 1217 (emphasis added), *aff'd*, 2024 UT 2. *See Granere*, 2024 UT App 1, ¶¶ 45–46; *Garcia-Lorenzo*, 2022 UT App 101, ¶¶ 49, 52–53; *Alires*, 2019 UT App 206, ¶ 22. Here, because there was some ambiguity in the prosecutor's closing argument on this point, the argument "fell short of sufficiently and clearly instructing the jury regarding which act corresponded with" which forcible sexual abuse count. *Garcia-Lorenzo*, 2022 UT App 101, ¶ 52.

¶67  During closing argument, in referencing the two forcible sexual abuse counts, the prosecutor stated,

> Count 3 and 4 are the same elements but for different actions. The defendant touched [Hannah's] breast and touched her buttocks without her consent. This occurred on the basketball court.

> [Hanna] and [Roommate] described the defendant repeatedly touching and groping [Hannah's] bottom, specifically her breasts and buttocks. He did so just by being told to stop in the store and then being told to stop again while playing basketball.

¶68 Pointing to this statement, the State argues that "[t]he jury was instructed on general unanimity principles" because "[t]he prosecutor told the jury that the two forcible sexual abuse counts occurred 'on the basketball court' when Macleod 'touched [Hannah's] breast and touched her buttocks without her consent.'" Concerning the statement's mention of "the store," the State asserts that "[t]he prosecutor was only referencing how Macleod was 'told to stop in the store' to provide context for the lack of consent to the criminal touches later 'while playing basketball.'" Macleod, on the other hand, asserts that the State did not mitigate prejudice because "[w]hile the prosecutor said the actions 'occurred on the basketball court,' in the next sentence she said it happened 'in the store' and 'while playing basketball.'" Thus, quoting *Garcia-Lorenzo*, he asserts that "it is entirely possible (and perhaps even likely) that the jury simply understood the prosecutor to be saying that, because [the forcible sexual abuse] allegedly happened on multiple occasions, it was more likely to have also happened on [the basketball court]." *See* 2022 UT App 101, ¶ 52.

¶69 Absent the mention of "the store" during that portion of closing argument, the statement likely would have mitigated any prejudice resulting from Counsel's deficient performance. *See Paule*, 2021 UT App 120, ¶¶ 45, 48 (holding that the prosecutor "clearly identified for the jury which factual circumstance formed the basis for its obstruction of justice charge" when he stated during his opening statement "that the obstruction count was for when . . . Paule took that shotgun, and threw it off the balcony in order to hinder, delay, or prevent the investigation," and when, during closing argument, he "reemphasized that the obstruction

charge was for when Paule threw the gun over the balcony")
(quotation simplified). But the somewhat confusing reference to
"the store" muddied the waters, rendering the statement
insufficiently clear to "cure" the prejudice resulting from
Counsel's failure to request an adequate unanimity instruction.

¶70 Even if the State is correct that the prosecutor referenced
"the store" incident for the purpose of demonstrating lack of
consent, the phrasing was confusing.[15] The sentence, "He did so
just by being told to stop in the store and then being told to stop
again while playing basketball," without more, does not explicitly
inform the jury that the prosecutor had switched gears from
discussing unanimity to discussing consent. Furthermore,
without specific mention of "consent," members of the jury could
have understood the phrase "He did so" to reference the unlawful
touches for which Macleod was charged and thus to also include
any touches that took place at the grocery store as well as on the
basketball court. Thus, at the very least, the purpose for which the
prosecutor mentioned "the store," especially when delivered
through the medium of speech, was subject to reasonable
misinterpretation. *See Garcia-Lorenzo*, 2022 UT App 101, ¶ 52
(stating that "it is entirely possible" for the jury to have
understood the prosecutor's statement to mean something other
than what the State was arguing on appeal). For these reasons, we
hold that the State's closing argument did not sufficiently clarify
for the jury that the two counts of forcible sexual abuse were
limited to unlawful touching of the breasts and buttocks that
occurred on the basketball court, and thus the State failed to
mitigate the prejudice Macleod suffered as the result of Counsel's
deficient performance.

¶71 Additionally, the evidence supporting the two forcible
sexual abuse convictions was "not so overwhelming that we can

_____

15. On appeal, we have the benefit of parsing a transcript of the
statement. The jury, however, did not have that opportunity.

conclude that the jury must have unanimously agreed on [the same] act—as opposed to [other alleged acts]—as the basis for its conviction" on those counts. *State v. Baugh*, 2022 UT App 3, ¶ 22, 504 P.3d 171, *cert. granted*, 525 P.3d 1257 (Utah 2022). *See Strickland v. Washington*, 466 U.S. 668, 696 (1984) ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). "Our supreme court has described convictions in" cases where "there was no confession, no third-party eyewitnesses, and no physical evidence" as "not strongly supported by the record." *State v. Burnett*, 2018 UT App 80, ¶ 39, 427 P.3d 288 (quotation simplified), *cert. denied*, 432 P.3d 1232 (Utah 2018). *See State v. Saunders*, 1999 UT 59, ¶ 13, 992 P.2d 951 (noting, among other things, the lack of physical evidence or third-party witnesses corroborating the victim's testimony in that case). Here, there was no confession and no physical evidence corroborating Hannah's allegations of forcible sexual abuse.[16] And although Roommate corroborated certain portions of Hannah's testimony, Roommate also contradicted her testimony in ways that have potentially significant unanimity implications.

¶72   Hannah's and Roommate's testimonies were "conflicting . . . as to which acts occurred," *State v. Alires*, 2019 UT App 206, ¶ 28, 455 P.3d 636, *cert. denied*, 466 P.3d 1076 (Utah 2020), at the grocery store and which on the basketball court.[17] Namely,

---

16. Because Hannah testified the alleged touching at the store and on the basketball court occurred over the clothes, the touch DNA found on the teal underwear was not attributable to the alleged forcible sexual abuse.

17. For purposes of this argument, we assume that the jury understood the State's closing argument to limit its consideration to allegations of nonconsensual touching that occurred at the grocery store and on the basketball court, to the exclusion of the allegations of touching that Hannah alleged occurred on her bed.

Hannah testified that at the grocery store, Macleod's "hands did kind of touch my butt, but it wasn't like grabbing it," whereas Roommate testified that he saw Macleod "[g]roping breasts, thighs, and sides." And on the basketball court, Hannah testified that Macleod grabbed her by the waist, touched her buttocks over the clothes, and at one point touched her breasts,[18] but Roommate testified that he saw Macleod grope her inner thighs and "breast area." Thus, although Roommate's testimony corroborated Hannah's general allegations that Macleod touched her, it largely contradicted her account when it came to specifics. Depending on whose testimony the individual jurors credited, it is entirely possible that they disagreed on which touches occurred where, even if they unanimously agreed that unlawful touches occurred at one location or another. *See generally id.* ¶ 29 ("Where the evidence is so readily subject to different interpretations, we are not persuaded that the jury would have unanimously convicted had the error not existed.") (quotation simplified); *id.* ¶¶ 28–29 (holding that the defendant was prejudiced by erroneous unanimity instructions where the evidence supporting the conviction "was not overwhelming," the testimony "was conflicting . . . as to which acts occurred," and "the surrounding circumstances were sufficiently ambiguous"). And although Hannah and Roommate both testified that Macleod touched her breasts while on the basketball court, the factual issue remained as to whether that touch was intentional, given that Hannah said they were playing a game of basketball and Macleod said they were playing HORSE at the time of the touch.

¶73    In sum, Macleod has established that he was prejudiced by Counsel's failure to request more specific unanimity instructions on the two forcible sexual abuse counts. We accordingly reverse

---

18. Officer additionally testified that Hannah told him at the hospital that on the basketball court, Macleod "kept trying to grab her . . . private areas: Buttocks, thighs, breasts, vagina area."

those convictions and remand the case for a new trial on those counts.

## IV. Cumulative Error

¶74 Macleod also argues that the cumulative effect of multiple instances of Counsel's deficient performance was prejudicial. "A reviewing court will reverse a jury verdict under the cumulative error doctrine only if the cumulative effect of the several errors undermines confidence that a fair trial was had." *State v. Killpack*, 2008 UT 49, ¶ 56, 191 P.3d 17 (quotation simplified). Although we reversed his two forcible sexual abuse convictions on ineffective assistance grounds, the prejudice Macleod suffered from Counsel's failure to request a proper unanimity instruction was limited to those convictions. The lack of a proper unanimity instruction on the forcible sexual abuse counts had no prejudicial effect on his rape and object rape convictions.[19] We also held that Counsel did not perform deficiently by not objecting to alleged prosecutorial misconduct or to Roommate's hearsay testimony. This leaves only Macleod's claim that Counsel was ineffective for not objecting to Officer's alleged hearsay testimony. We decided that issue on prejudice grounds, holding that the alleged error was not prejudicial. Thus, there are no errors to accumulate, and this argument therefore necessarily fails. *See State v. Martinez-Castellanos*, 2018 UT 46, ¶ 40, 428 P.3d 1038 (stating that the cumulative error "doctrine will not be applied when claims

---

19. As noted above, we do not reach the merits of Macleod's claim that Counsel was ineffective for not requesting lesser included offense jury instructions on the forcible sexual abuse counts. *See supra* note 7. We also need not do so for the purposes of this cumulative error argument because, as with the ineffective assistance claim related to the lack of sufficient unanimity instructions, any prejudice would be limited to the forcible sexual abuse convictions and not extend to the remaining rape and object rape convictions.

are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm") (quotation simplified).

CONCLUSION

¶75    Because Counsel was not ineffective for not objecting to comments that allegedly amounted to prosecutorial misconduct or to inadmissible hearsay testimony, we affirm Macleod's rape and object rape convictions. But because Counsel was ineffective for not requesting sufficient unanimity instructions on the two forcible sexual abuse counts, we reverse those convictions and remand for a new trial on those counts.

———————