2022 UT App 3

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BREVAN BRINGHURST BAUGH,
Appellant.

Opinion
No. 20200178-CA
Filed January 13, 2022

First District Court, Logan Department
The Honorable Angela Fonnesbeck
No. 181100862

Emily Adams, Freyja Johnson, and Cherise M.
Bacalski, Attorneys for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JILL M. POHLMAN
concurred.

MORTENSEN, Judge:

¶1      During its closing argument at Brevan Bringhurst Baugh's trial for two counts of aggravated sexual abuse of a child, the State referenced testimony of three instances of alleged abuse. But the State then told the jury that "those two counts can be fulfilled with . . . any two of those experiences" and that "any two of those incidents . . . described . . . can be the elements of both of these counts." The jury rendered a split verdict, and Baugh now appeals, contending that defense counsel provided ineffective assistance for failing to ensure the jury received proper instruction regarding unanimity. We agree; accordingly,

we vacate Baugh's conviction and remand for further proceedings consistent with this opinion.

BACKGROUND

¶2     While Baugh lived at the family house from 2012 to April 2014, his daughter Sasha[1] saw a pornographic image of a "hand job" Baugh had left "up on the computer." On another occasion, she "walked in on [him] masturbating." In April 2014, when Baugh separated from his wife, Sasha's mother, Sasha and her siblings spent their time with Baugh at his apartment.

¶3     Several years later, while Sasha was visiting Baugh, he made a comment to Sasha about her clothing choices, stating that even though the clothing choices were inconsistent with standards by which they aspired to live, he was otherwise "fine" with them. The comment upset Sasha, and memories of the past started "coming back." Unsettled by the incident, Sasha reported her discomfort to her mother, who then suggested Sasha see a therapist. During an ensuing therapy session, Sasha disclosed that, years before, Baugh had, on various occasions, forced her to touch his penis and give him "hand jobs."

¶4     The detective who responded to the therapist's report of abuse invited Sasha to conduct a recorded confrontation call "to get . . . some type of evidence . . . from" Baugh. But when Sasha initially confronted Baugh about the abuse, he denied it and asked if she was "misremembering things." When Sasha reminded him that he had taken her aside and apologized, Baugh insisted the apology was for her inadvertent exposure to pornography, and he stated, "[M]y concern here is that you're putting that together with something . . . about me that didn't happen."

---

1. A pseudonym.

¶5     As Sasha pressed and insisted that the abuse occurred, Baugh responded, "Well, what I certainly can't do is deny that and say that you're absolutely wrong because you get to feel however—you—you get to remember it however you remember it, and I can't deny that." When Sasha pressed further and described the abuse in detail, Baugh responded, "[Sasha], that's terrible. And I am very sorry for that. . . . I have no recollection of that. I am terribly sorry." And when pressed again and again, Baugh responded, "I am not denying it. . . . And—if you say I did it, then—then I'm sure I did. I'm sure I did." Baugh then denied that any abuse occurred at the family house. But Baugh's memory of the time period he was living in the apartment was fuzzier; he insisted that he "was messed up a lot," "was doing a lot to forget," and was taking "a lot of medicines to specifically try and make [himself] numb" and to make himself "forget the trauma" of his separation from Sasha's mother. "I guess what I'm saying," he continued, "is, if you say it happened, it happened . . . and I'm not going to deny it." He then said,

> I would never physically take your hand and put it down my pants. If I did that at the [apartment], I can, hmm, totally accept that and say, oh, that's awful. . . . And I've got—and I've got to own that, even if I did it while on a whole bunch of medications or high on pot or whatever and don't remember it, but I've got to own it.

¶6     Shortly after the confrontation call, Baugh was arrested, and the investigating detective followed up with an interrogation. During the interrogation, Baugh conceded that he did not deny the accusation of abuse in the apartment but attributed his failure to deny to being "out of it" during the time he lived at the apartment. Baugh also conceded that Sasha had been exposed to pornography but he consistently and repeatedly denied the abuse allegations. The interrogation concluded with the following exchange:

> Detective: "Have you had your daughter giving you hand jobs for years?"
>
> [Baugh]: "For years. Okay. No."
>
> Detective: "And when was the last time?"
>
> [Baugh]: "It would be at the [apartment] here is what you're telling me. I'm telling you at the [family house]."

The State charged Baugh with two counts of aggravated sexual abuse of a child: one count for abuse that allegedly occurred in 2012 and one count for abuse that allegedly occurred in 2014.

¶7 At trial, Baugh testified that when he told the detective that "the last time something sexual happened between" him and Sasha was at the family house, he was not referring to any abuse but was referring only to the pornography exposure. Even though he maintained that no abuse had ever occurred, Baugh also explained that he had not disputed Sasha's claim of abuse at the apartment because he "wanted to . . . meet her where she's at and accept her" and provide "support," and because he wanted Sasha "to feel validated" and help her "deal with whatever issues she's going through." Baugh expressed his reasoning that "she's entitled to feel however she wants to feel, even if she is getting things mixed up." Baugh, however, maintained his position—"I didn't do what she's accusing me of."

¶8 Sasha on the other hand testified about three specific instances of abuse. She testified that Baugh had made her touch and rub his penis on two occasions at the family house—once in his bed and once in her bed—and on one occasion at the apartment. But nowhere in her testimony did Sasha explain specifically when the alleged abuse occurred.

¶9 During closing argument the State said,

Now, we haven't charged everything that we could have. We charged two counts. And those two counts can be fulfilled with—with any two of those experiences, any two of those incidents that she described, those can be the elements of both of these counts.

Neither the court nor defense counsel took issue with this statement. However, the jury instructions informed the jury that "[o]pen discussion" could help it "reach a unanimous agreement on a verdict." The instructions also directed the jury that it should "[t]ry to reach a unanimous agreement, but only if [it could] do so honestly and in good conscience" and that "every single juror must agree with the verdict before the defendant can be found 'guilty' or 'not guilty.'" And although the instructions distinguished the counts based on the date of the alleged abuse—2012 for count one, and 2014 for count two—the verdict forms required the jury to indicate only whether it unanimously agreed that Baugh was "guilty" or "not guilty" for each count and not whether it agreed on which instance of alleged abuse constituted the crime for which the jury agreed to convict. The parties have not identified, and we have not found, anywhere in the record where defense counsel requested either specific unanimity instructions pertinent to each count or a special verdict form requiring the jury to specify which act was linked with each conviction.

¶10     The jury then retired to deliberate, but nearly seven hours into those deliberations—a few minutes after 10:00 p.m.—it indicated that it had arrived at an impasse. The court responded by orally instructing the jury through the bailiff "to go back and keep trying"—recounting the incident for the record only after

the fact.[2] And at 11:43 p.m. the jury issued a split verdict, acquitting Baugh on one count of aggravated sexual abuse of a child in 2012 and convicting him on one count of aggravated sexual abuse of a child in 2014. Baugh appeals.

---

2. Through one issue raised on appeal—that we need not resolve—Baugh sought relief based on the court's failure to make a contemporaneous record of how the jury was instructed when it reported its impasse. In light of this, we note the significance of *any* supplemental instructions and emphasize how important it is for the court to record all the instructions the jury receives rather than try to recreate the record after the fact. Furthermore, we express our concern with the practice of trial courts instructing juries without involvement of counsel. *Cf. State v. Johnson*, 2016 UT App 223, ¶ 22 n.4, 387 P.3d 1048 ("A court is not required to consult counsel before responding to a jury's question by simply referring the jury back to instructions already approved by counsel. However, such a course of action is risky because the court's response to a jury question may be construed as a new instruction." (cleaned up)). We also advise trial courts to refrain from orally communicating with a jury through a bailiff and off the record. In this case, had we needed to resolve the issue, we would not have had the information necessary to do so because, although the trial court attempted to reconstruct the record, the court's summary shed no light on what the bailiff actually said to the jurors. *Cf. State v. Martinez*, 2021 UT App 11, ¶ 58, 480 P.3d 1103 (Christiansen Forster, J., concurring) ("[T]he district court's failure to record the in-chambers discussion with counsel or to memorialize what interaction occurred with [the] jury and how [a jury instruction] was presented to an apparently deadlocked jury did a disservice to [the defendant] and his appellate counsel by hampering their attempt to re-create that record two years post-trial.").

ISSUE AND STANDARD OF REVIEW

¶11 Baugh contends that defense counsel rendered constitutionally "ineffective assistance in failing to ensure that the jury was properly instructed regarding unanimity." In particular, Baugh asserts that "[t]he jury was not instructed that [it] must unanimously agree as to which of the three alleged incidences constituted each [of the two] charged crime[s]" and that this failure prejudiced his defense. (Emphasis omitted.) "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Beckering*, 2015 UT App 53, ¶ 18, 346 P.3d 672 (cleaned up).

ANALYSIS

¶12 To prevail on a claim that defense counsel rendered ineffective assistance in failing to ensure the jury received proper unanimity instruction, Baugh must make a two-part showing. *See State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350. First, Baugh must show that "his counsel's performance was deficient in that it fell below an objective standard of reasonableness," *id.* (cleaned up), that is, "whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable," *id.* ¶ 36. Second, Baugh must show that "the deficient performance prejudiced the defense," *id.* ¶ 28 (cleaned up), in such a way as "to undermine confidence in the outcome of the proceeding"— i.e., "that the outcome of [the] case would have been different absent counsel's error," *id.* ¶ 43 (cleaned up). Here, Baugh has carried his burden.

I. Deficient Performance

¶13 Regarding deficient performance, Baugh contends that defense counsel's assistance "fell below an objective level of

reasonableness" when he "did not ensure that the jury was instructed that [it] must unanimously agree on which of the three alleged instances [of abuse] constituted the criminal act for each charge on which [it] convicted [him]." We conclude that under the circumstances of this case, it constituted deficient performance for counsel to fail to request that the jury receive proper unanimity instruction through either specific unanimity instructions for each count or a special verdict form requiring the jury to specify which alleged act was linked with each conviction.

¶14    The Sixth Amendment to the United States Constitution; Article 1, Section 10 of the Utah Constitution; and rule 21(b) of the Utah Rules of Criminal Procedure each require "that in criminal trials, a jury reach a unanimous verdict." *State v. Mendoza*, 2021 UT App 79, ¶ 9, 496 P.3d 275; *see also Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020) (discussing the applicability of the Sixth Amendment's unanimity requirement to criminal trials). Moreover, the "requirement of unanimity is not met if a jury unanimously finds only that a defendant is guilty of a crime"—instead, the jury must reach "unanimity as to each count of each distinct crime charged." *State v. Hummel*, 2017 UT 19, ¶ 26, 393 P.3d 314 (cleaned up). In other words, the jury must "agree on a specific criminal act for each charge in order to convict." *State v. Alires*, 2019 UT App 206, ¶ 22, 455 P.3d 636.[3]

---

3. The State contests the applicability of *State v. Alires*, 2019 UT App 206, 455 P.3d 636, to this case. Specifically, the State argues that *Alires* does not apply because it was not published until a few days after the trial occurred. But the *Alires* court thoroughly identified the established law that should have indicated the need for defense counsel in that case to request appropriate unanimity instructions. *Id.* ¶¶ 17–25. The *Alires* court noted that "[t]he right to a unanimous verdict in criminal cases is

(continued…)

¶15 In *Alires*, counsel rendered deficient performance by "propos[ing] instructions that did not require the jury to be unanimous as to the specific acts supporting each count of conviction." *Id.* ¶ 17. In that case, the defendant had been charged with six counts of aggravated sexual abuse of a child against two different children, but the jury heard testimony of at least eight instances of such abuse—six against the first child and two against the second. *Id.* ¶ 22. In relation to the six allegations involving the first child, the State argued that "the jury could convict . . . on four counts based on any of the six alleged touches . . . in 'any combination.'" *Id.* And in relation to the two allegations concerning the second child, "the State did not identify which alleged touch . . . related to which count." *Id.*

---

(…continued)
guaranteed by Article 1, Section 10 of the Utah Constitution (the Unanimous Verdict Clause)." *Id.* ¶ 18. The court then went on to cite *State v. Saunders*, 1999 UT 59, ¶ 60, 992 P.2d 951 ("The Article I, section 10 requirement that a jury be unanimous is not met if a jury unanimously finds only that a defendant is guilty of a crime."), and *State v. Hummel*, 2017 UT 19, ¶ 26, 393 P.3d 314 ("The Unanimous Verdict Clause requires unanimity as to each count of each distinct crime charged by the prosecution and submitted to the jury for decision." (cleaned up)). And based on the established law, the *Alires* court concluded, "Where neither the charges nor the elements instructions link each count to a particular act, instructing the jury that it must agree as to which criminal acts occurred is critical to ensuring unanimity on each element of each crime." *Alires*, 2019 UT App 206, ¶ 23. Accordingly, if the law was well enough established at the time *Alires* was tried, such that the *Alires* court could determine that counsel there performed deficiently in failing to request a proper unanimity instruction, the law was also well enough established that defense counsel here should have recognized the need to request appropriate unanimity instructions.

"Once the State failed to elect which act supported each charge, the jury should have been instructed to agree on a specific criminal act for each charge in order to convict," *id.*, but counsel did not request such an instruction, and "[a]s a result, the jury was never instructed that it must unanimously agree that [the defendant] committed the same unlawful act to convict on any given count," *id.* ¶ 23. Accordingly, in that case, "[i]t was objectively unreasonable for . . . counsel to propose jury instructions that did not require unanimity as to the specific act that formed the basis of each count resulting in conviction."[4] *Id.* ¶ 24.

¶16    Likewise, in this case, Baugh faced multiple charges for aggravated sexual abuse of a child, but the jury heard testimony of more instances of alleged abuse than the State charged. *See supra* ¶¶ 6–8. And the instructions "did not require the jury to be

---

4. Importantly, whether a failure to request a proper unanimity instruction results in prejudice will depend on the facts of each case. For example, in some circumstances the evidence will be such that although the instructions could allow for a mix-and-match approach, it will be apparent that the jury would have agreed on a certain act for each count if the need for such agreement had been explained to it. *See*, *e.g.*, *State v. Paule*, 2021 UT App 120, ¶¶ 44–45 (holding that unanimity was not a concern where the State presented evidence that could support multiple bases for an obstruction of justice charge but focused on only one of those bases in prosecuting the case). In short, where there are multiple criminal acts at issue, the lack of a unanimity instruction does not necessarily equal prejudice—the specific facts and circumstances of each case and the strength or weakness of the evidence will be paramount to determining if prejudice has been established. *See*, *e.g.*, *State v. Case*, 2020 UT App 81, ¶ 26, 467 P.3d 893.

unanimous as to the specific acts supporting each count of conviction." *See Alires*, 2019 UT App 206, ¶ 17.

¶17    As in *Alires*, nothing in this case conclusively linked the allegations to the counts listed in the instructions. While the instructions here did link each count with a certain timeframe—2012 for count one and 2014 for count two—the instructions did not link each count with a particular act because nothing the jury heard at trial linked any particular act with an associated timeframe. Sasha was never asked to explain when the alleged abuse occurred, and although she indicated that two instances of abuse occurred at the family house and one instance of abuse occurred at the apartment, the association between an instance of abuse (alleged to have occurred in a specific place) and a particular count (alleged to have occurred during a particular time) was not established because Baugh lived at both the family house and the apartment in 2014. Notably, the jury did not convict Baugh on count one, the count associated with 2012, when Baugh undisputedly lived only at the family house. And although the jury convicted Baugh on count two, because Baugh lived in both the family house and the apartment in 2014, we cannot know which one of the three instances of alleged abuse (one of two in the family house or the one in the apartment) was the one for which the jury convicted him.

¶18    Further, like the prosecutor in *Alires*, the State apparently sought to use this ambiguity to its advantage by inviting the jury to convict on both counts based on the idea that "those two counts can be fulfilled with—with any two of those experiences" and that "any two of those incidents . . . can be the elements of both of these counts." As this court stated in *Alires*, "Where neither the charges nor the elements instructions link each count to a particular act, instructing the jury that it must agree as to which criminal acts occurred is critical to ensuring unanimity on each element of each crime." *Id.* ¶ 23. The prosecutor's comments directly contradicted the basic principles of

unanimity, and defense counsel neglected to request that the jury was otherwise properly instructed.

¶19 "[T]he jury [had] to be unanimous as to the specific acts supporting each count of conviction." *See id.* ¶ 17. And without a sufficient link to the actions in the instructions themselves, an instruction requiring as much was "critical to ensuring unanimity." *See id.* ¶ 23. "By failing to require juror unanimity as to each underlying act, the instructions—coupled with the prosecutor's closing argument—effectively lowered the State's burden of proof." *See id.* ¶ 25. And where defense "counsel bears a duty to assist the defendant in reaping the benefits of a jury trial and to hold the State to its full and complete burden of proof," such a failure constitutes deficient performance. *See State v. Mendoza*, 2021 UT App 79, ¶ 17, 496 P.3d 275.

## II. Prejudice

¶20 Regarding prejudice, Baugh contends that the ambiguity in the jury instructions, the dearth of consistent evidence, and the State's invitation for the jury to apply any act to any charge all work together to establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," such that our confidence in the proceeding's outcome should be undermined. (Cleaned up.) Baugh persuades us on this point, and we determine that "consider[ing] the totality of the evidence," defense counsel's deficient performance has undermined our confidence in the proceeding's outcome. *See State v. Alires*, 2019 UT App 206, ¶ 27, 455 P.3d 636 (cleaned up).

¶21 Although Sasha testified about two instances of abuse at the family house and one instance of abuse at the apartment, Baugh resided in the family house from 2012 until April 2014 and also resided in the apartment in 2014. Thus, the jury had no way of inferring *when* two of the alleged acts of abuse occurred based on *where* the acts occurred. The jury instructions

distinguished the counts, not by location but based on the date of the alleged abuse—2012 for count one and 2014 for count two. By attempting to link the counts with acts that occurred at a particular time but not at a particular location, the unanimity that would otherwise have been inherent in the conviction based on location was lost when the jury heard no evidence about when the alleged abuse occurred. The fact that the jury heard nothing specific about when each act occurred creates a reasonable probability that the jurors did not agree on which act of alleged abuse supported each count. As noted, the jury heard allegations that two acts of abuse occurred in the family house and one occurred in the apartment. But the jury did not convict Baugh on count one, the 2012 count, which occurred when Baugh lived only at the family house. And because Baugh lived in both the family house and the apartment in 2014, we cannot know if the jury agreed that the conviction for count two, the 2014 count, was for one of the two alleged acts of abuse in the family house or the alleged act of abuse in the apartment. It is therefore entirely possible that some (but not all) of the jurors convicted on count two based on the belief that the alleged abuse occurred at the family house, while some other (but not all) jurors convicted based on the belief that the abuse occurred at the apartment.

¶22 Further, although the alleged abuse that occurred in the apartment had to have occurred in 2014, the evidence of that abuse is not so overwhelming that we can conclude that the jury must have unanimously agreed on that act—as opposed to an alleged act of abuse at the family house—as the basis for its conviction on count two for abuse in 2014. *See id.* ("A verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." (cleaned up)). Sasha reported the abuse years after it occurred, while Baugh maintained—through the confrontation call, the interrogation, and the trial—that no abuse happened in the family house and that he had no memory of any abuse at the

apartment. And although the State asserts that Baugh "admitted to" the act of abuse in the apartment, it points to no language where Baugh expressly admitted the allegations and it instead insists that his non-denial is actually an admission. But at trial Baugh denied abusing Sasha and testified that he did not deny Sasha's accusations because he wanted to validate his daughter's feelings even though he maintained she was "getting things mixed up." And while the jury was free to disregard his explanation, we cannot, on this cold record, conclude that there is no reasonable probability that the jury found his explanation credible.

¶23 Moreover, we note the State has relied on Baugh's alleged admission both below and on appeal; but importantly, the theory of this admission's origin and significance has changed. At trial, in support of its claim that Baugh had admitted to abuse, the State relied on the exchange at the end of the interrogation where Baugh responded to the detective's question about whether he "had [his] daughter giving [him] hand jobs for years." Specifically, the State argued that Baugh's statement was an admission that he had abused Sasha at the family house. On appeal, however, the State acknowledges that this statement was ambiguous and shifts its focus to Baugh's failure to deny the allegations during the confrontation call as the critical admission.

¶24 But admission or not, the very fact that the State can espouse multiple theories regarding the existence of an admission demonstrates the potential variability in the way the jury could have viewed the evidence—that is, we cannot be confident as to how it viewed the evidence including any possible admission. Indeed, regarding the failure to deny the allegations during the confrontation call, we do not know whether the jury believed this was because the abuse actually occurred or because Baugh truly was validating Sasha. And regarding the interrogation question about whether Baugh had

been abusing Sasha for years, we do not know whether the jury understood Baugh's response to be an admission or whether it accepted his explanation that any response he gave referred to her exposure to pornography. Accordingly, the jurors might have attributed different significance to different explanations, and given that any admission would also not establish that the jury unanimously agreed which act constituted the crime for which it convicted, we remain unable to identify one charge on which we can say with confidence it would have convicted.

¶25     Finally, we view the State's invitation to the jury to take any allegation and apply it to any count as significantly undermining our confidence in the proceeding's outcome. *See id.* ¶ 26. The State argued that the "two counts can be fulfilled with . . . any two of those experiences" that Sasha described and that "any two of those incidents . . . can be the elements of both of these counts." The State openly invited the jury to engage in a free-for-all when applying the acts to the counts, and in so doing, rejected any theory that the acts that had been testified to were specially linked to particular counts based on the timing and location of the underlying criminal act. *Cf. id.* ¶ 30 (expressing concern with the verdict in part because "[t]he State told the jury in closing argument that any of the alleged acts against a particular victim could support any of the charges relating to that victim"). Following this invitation (an invitation that loomed large in the absence of any specific unanimity instruction), the jury deliberated over a case with relatively simple facts for nearly seven hours before announcing that it had arrived at an impasse. The court instructed the jury to keep trying, and at 11:43 p.m., over an hour later, the jury returned with a split verdict. All this suggests that the jury might have struggled with the evidence.

¶26     Accordingly, considering all the circumstances, we see a reasonable probability that but for defense counsel's deficient performance, the proceeding's outcome would have differed—in

other words, under these circumstances our confidence in the outcome has been undermined.

CONCLUSION

¶27 Because defense counsel performed deficiently when he did not request that the jury receive proper unanimity instruction, and because this deficiency prejudiced Baugh's defense in such a way that undermines our confidence in the proceeding's outcome, we vacate Baugh's conviction and remand for further proceedings.[5]

———————

5. "Ordinarily, a defendant who prevails on an ineffective assistance of counsel claim is entitled to a new trial. But where the counts of conviction cannot be distinguished from the counts on which the defendant was acquitted, a retrial may be prohibited by the Double Jeopardy Clause. We express no opinion on the merits of the double-jeopardy issue, which will not be ripe unless and until the State seeks a retrial." *Alires*, 2019 UT App 206, ¶ 31 n.7 (cleaned up).