**2024 UT App 38**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ROBERTO GARCIA,
Appellant.

Opinion
No. 20210381-CA
Filed March 21, 2024

Second District Court, Ogden Department
The Honorable Joseph M. Bean
No. 201901238

Emily Adams, Freyja Johnson, and Melissa Jo
Townsend, Attorneys for Appellant

Sean D. Reyes and Jonathan S. Bauer,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

LUTHY, Judge:

¶1     Roberto Garcia appeals his convictions of rape of a child, sodomy on a child, and aggravated sexual abuse of a child. He contends that he did not receive effective assistance of counsel. We conclude that in each asserted instance of ineffective assistance, Garcia has failed to show either deficient performance or resulting prejudice, and we therefore affirm.

## BACKGROUND[1]

### *Delayed Disclosure of Allegations*

¶2 When Alicia[2] was fifteen years old, she told her mother (Mother) that Garcia, Alicia's uncle, had sexually abused her some years earlier. Mother contacted the police, and they thereafter had Alicia participate in a forensic interview. Based on Alicia's disclosures during the interview, Garcia was charged with one count each of rape of a child, sodomy on a child, and aggravated sexual abuse of a child—all first-degree felonies. Garcia entered not-guilty pleas, and the case proceeded to trial.

### *Opening Statements*

¶3 During its opening statement, the State discussed Alicia's forensic interview, explaining how such interviews are conducted according to specific guidelines and procedures "to ensure that they're getting accurate information from the child and avoiding suggestion in asking those questions." The State then recounted Garcia's conduct that Alicia had disclosed.

¶4 Garcia's trial counsel (Counsel) then gave his opening statement. He told the jury that the alleged conduct did not occur and that "it's important to understand that there are usually two sides to every story." He explained that the defense would present an expert who would testify "how memory is malleable," "how

---

1. "In general we view the facts in the light most favorable to the jury verdict and recite them accordingly. However, we recite trial testimony to the extent it is necessary to fully understand the issues raised on appeal." *State v. Pirela*, 2003 UT App 39, n.1, 65 P.3d 307 (cleaned up), *cert. denied*, 72 P.3d 685 (Utah 2003).

2. We employ a pseudonym for the victim. *Cf.* Utah R. App. P. 24(d) (requiring in briefs that the "identity of minors . . . be protected by use of descriptive terms, initials, or pseudonyms").

it's not exact," and "how it is basically created quite often by the human brain," and that this expert would help the jury "better understand why there [are] two stories in this case." Counsel also said that the defense would present the testimony of several family members who would provide "significant evidence about how some of the claims that [Alicia] made just simply couldn't logically happen."

*The State's Case*

¶5 Alicia testified first, detailing the events of abuse. She related that when she was seven years old, Garcia "would always ask to pick [her] up" from choir. One day, after picking Alicia up and driving to his home, Garcia took her into his room. "[H]e told [Alicia] that [they] were going to play a new game." She asked him what it was called, and he told her it was called "lotion." Garcia "then took off [Alicia's] clothes and laid [her] on the bed and put a pillow over [her] face" and stuck "the tip of his penis in and out of [her] until he [ejaculated]. Then he said that he had put lotion on [her]." Alicia clarified that where Garcia put his penis was "[i]nside of [her] vagina."

¶6 Alicia testified that after this first incident, "the lotion game" would "happen" "[a]lmost every time" that Garcia picked her up from choir, which "was at least once or twice a week." Alicia testified that during these incidents Garcia would also engage in "fingering," which she defined as Garcia's touching of her clitoris with his hand.

¶7 Alicia also testified of an incident of oral sex that occurred when she was sleeping over at Garcia's house and watching a movie: "[H]e told me to take my clothes off and lay on top of him. And [then] he like positioned me to where my face was by his penis and my vagina was by his face. And he went to go and try to [perform oral sex on me], and I had closed my legs. And then he had told me to [perform oral sex on him]." Alicia stated that

when she awoke the next morning, there was "throw up all over the bed because [she] had gotten sick."

¶8 Alicia explained that Garcia had encouraged her to get permission to come over for the sleepover: "[H]e had a pool pass . . . and he told me I could go with him if I had done everything he told me. And . . . he had said that he would take me to like McDonald's and like I'd get a happy meal and I'd take home the toy, and stuff like that." She indicated that these promised activities would normally occur after the abuse incidents.

¶9 Alicia related two additional incidents that "made [her] feel uncomfortable." During the first incident, Garcia was helping her down from a roof and, while doing so, "grab[bed] [her] vagina." The second incident occurred shortly after she turned eight, when she was swimming with Garcia in a hotel pool while waiting for other family members staying at the hotel to join them. Alicia testified that Garcia "started touching [her] vagina and went to go inside [her] . . . swimsuit bottoms" but she then swam away from him.

¶10 Alicia then recounted that while Garcia was driving her home after the swimming pool incident, he stopped at a church and asked her if she wanted to play the lotion game again. Alicia testified, "I told him no and that if he didn't take me home, I'd walk." Alicia explained that, in response, Garcia said, "Well, if you tell anyone about this, I'm never going to forgive you," and, "I'll be so mad at you. I'll never talk to you again. None of us will ever talk to you again."

¶11 The prosecutor asked Alicia about her eventual disclosure of the abuse. Alicia explained that one day after school, when "everything was just eating [her] up" and her past "was really heavy on [her] mind," she talked with her stepmother and was able to finally disclose that Garcia had sexually abused her. Then Alicia related that Mother, after also learning of the abuse, called Garcia to confront him and that he denied the allegations,

accusing Alicia of being a liar and saying that she was going to ruin his life. Alicia said that it was "[r]eally nice" to be able to tell someone about the abuse, but she also said it was "really scary" because Garcia scared her. She said that she had not told anyone earlier in order "to protect [her] family."

¶12 Next to testify was a forensic interviewer with the Children's Justice Center (Expert). She testified as to how forensic interviews with children are conducted and that they follow a particular forensic interview technique (FIT) that addresses "what types of questions work best with eliciting narrative from children, and how to do so in a non-suggestive and non-leading way." She also identified reasons why it is "[e]xtremely common" for children to delay disclosing sexual abuse. Expert then briefly discussed Alicia's forensic interview, which Expert had not conducted but had reviewed, and identified the reasons Alicia had given in the interview for delaying her disclosure of abuse: "that she sometimes was bribed with a pool pass"; "[t]hat sometimes she would receive McDonald's"; and "that she was really, really scared of [Garcia]," who had told her "if she told somebody about what had happened, that she would be in trouble." Expert testified that these reasons were "consistent with known reasons for delayed disclosures in sex abuse cases."

¶13 The State also presented testimony from a detective who was assigned to follow up on Alicia's allegations (Detective). He explained that he had arranged for Alicia's forensic interview and that he had later received a copy of the interview. When asked whether things pertinent to his investigation were disclosed during Alicia's interview, Detective related the allegations Alicia had made in the interview, including a description of the lotion game, the oral sex incident, and the incident in the swimming pool. Detective also related that he had spoken with Alicia and asked her why she had delayed reporting the abuse and that she had said "she didn't even want to say anything" but that "she was talking to her stepmom and her stepmom elicited it out of her."

¶14 Mother also testified at trial. She explained that Alicia eventually disclosed the abuse to her and shared with her details regarding the abuse. Mother recounted what Alicia told her about the lotion game and its surrounding circumstances as well as the incident in the swimming pool. Mother also explained that Alicia said the abuse happened when she was seven years old and lasted for "only a year" "[b]ecause [she] was baptized at eight and [she] started knowing that it was wrong." Mother then recounted the various actions she had taken in response to Alicia's disclosure, including reporting it to police and calling Garcia to confront him about the allegations. Mother said that, "looking back," she now realized that Alicia began struggling in various respects during the time of the alleged abuse, suffering frequent stomachaches and headaches, having nightmares, performing poorly in school, acting out with unexplained anger, acting more withdrawn, and starting to bite her nails and pick at her eyebrows.

¶15 Finally, the State called several other family members to support its case. Alicia's stepmother testified regarding Alicia's initial disclosure and how she urged Alicia to tell her parents what had happened. She also confirmed that Alicia had spent time with Garcia during the time frame of the alleged abuse, and she testified that "[a]s [Alicia] got older, she didn't want to go over [to Garcia's house] as much" and that during the period of alleged abuse, Alicia became angry, more defiant, and less social.

¶16 Alicia's father then testified, sharing that he remembered "a certain summer" when Alicia "started hanging out with [Garcia] a lot more than normal" and the two "would go to public pools a lot more." He also related that in the time after the alleged abuse, Alicia had begun struggling in school and had become more distant and less focused.

¶17 Alicia's grandfather also testified, recounting that Garcia had picked Alicia up from school a few times and that Garcia took Alicia swimming a couple of those times. However, the

grandfather had not noticed changes in Alicia's behavior during the time frame of the alleged abuse.

¶18 Then Alicia's grandmother testified. She also remembered that Garcia would sometimes pick Alicia up from school and would sometimes take her swimming. The grandmother remembered Alicia sleeping over at Garcia's house and that Alicia had thrown up during one of those sleepovers. The grandmother further testified that the relationship between Garcia and Alicia soured at some point when Alicia was "[s]even or eight maybe." The grandmother explained that initially "their interactions were friendly" and "[t]hey seemed to really like each other" but that she later noticed that "something was different, something was strange" between them and "that they didn't speak to one another, that they didn't say hello to one another." The grandmother said she asked them what was wrong but "couldn't get either of them to give [her] a straight answer." The grandmother also testified that when discussing Alicia's quinceañera,[3] Alicia stated, "If [Garcia] shows up, I'm calling the police," but that Alicia then explained she was mad at Garcia for how he treated her aunt.

*The Defense*

¶19 The defense then presented its case. Counsel started by calling a clinical psychologist "to educate . . . the jury about the nature of human memory," specifically about how "post-event information . . . can interfere with the actual memory of the original event" and create "false memories." The psychologist explained an experiment showing that when subjects were

---

3. A quinceañera is "a celebration of a girl's fifteenth birthday that is traditionally observed in Latin American cultures to mark her transition to adulthood." *Quinceañera*, Merriam-Webster, https://www.merriam-webster.com/dictionary/quinceañera [https://perma.cc/LH2H-M5FW].

questioned, their "memory depended on the way questions were worded." He continued, "We're all suggestible. And the power of suggestion can shape, influence, or even at times implant a false memory or false suggestion by other people. So in other words, by suggestion a memory can be created or get incorporated into memory whether it happened or not." The psychologist also referenced several ways in which "children are vulnerable to outside influences that can lead to fabricated testimony," including that "children incorporate aspects of interviewer questions into their answers in an attempt to tell the interviewer what the child believes is being sought," that "[r]epeated questioning of children causes them to change their answers," that "[c]hildren are also susceptible to leading and suggestive questions," and that "[p]ositive reinforcement by the interviewer can taint child testimony."

¶20 On cross-examination, the State asked the psychologist about FIT protocols for conducting child interviews, and the psychologist acknowledged that those standards were developed in response to some of the memory issues he had referenced and that they were developed "[t]o reduce suggestibility in the interview process." But on re-direct examination, the psychologist agreed that "even if [interviewers] used the FIT interview method," there is "still a possibility of contamination" of a child's memories.

¶21 The defense then presented the testimony of several family members who cast doubt on various aspects of Alicia's allegations. Garcia's sister testified that Garcia and Alicia were never alone together in the hotel swimming pool. Garcia's son testified that he remembered Alicia sleeping over at their house only twice and that she rarely came over. Garcia's other son testified that he could remember Alicia sleeping over only once and that she slept with Garcia's wife in the living room. Garcia's wife confirmed that she slept with Alicia in the living room when Alicia slept over, and she stated that Alicia was always in her sight

on those occasions. Garcia's wife also remembered that during one sleepover, Alicia "got ill" and "threw up on the couch" after being "up until like midnight snacking on stuff."

*The State's Rebuttal*

¶22    The State recalled Expert as a rebuttal witness, explaining that it was doing so "because there's been a lot of discussion about suggestibility from the defense's [psychologist witness]." The State had asked Expert to analyze Alicia's forensic interview, and it asked her questions regarding the results of that analysis. Expert explained to the jury the various types of questions a forensic interviewer might ask and also the two types of memory that questions can "tap into": recall memory and recognition memory. She explained, "[W]e know that by using open-ended questions, and avoiding forced choice questions, or the suggestive or leading, we tap into recall memory. And recall memory is typically more accurate." Expert testified that of the 122 questions from the substantive phase of Alicia's forensic interview, "107 questions tapped into recall memory, while only 15 questions tapped into recognition memory." She also referenced studies showing "that by the age of 10 . . . children are no more suggestible than adults."

*Jury Instructions and Closing Arguments*

¶23    The district court then read its final instructions to the jury. These included instructions setting forth the elements for each of the charged crimes. However, those instructions did not tie specific incidents of alleged criminal conduct to specific charges, nor did any jury instruction inform the jury that it had to agree as to which alleged act satisfied the elements of each of the crimes charged.

¶24    After the court read the jury instructions, the State made its closing argument. The State recapped the evidence, mentioning the lotion game incidents, the oral sex incident, the time Garcia

helped Alicia down from the roof, and the incident in the hotel pool. The State next addressed several of the jury instructions. In discussing the three elements instructions, the State argued that the rape elements had been met by the lotion game incidents, the sodomy elements had been met by the oral sex incident, and the aggravated sexual abuse elements had been met by the "instances . . . while playing the lotion game" when Garcia would touch her clitoris.

¶25 Counsel then delivered his closing argument. He reminded the jury of the presumption of innocence and the beyond a reasonable doubt standard, and he highlighted several problematic issues with the State's case: that memories "can be manufactured in certain situations," that the case was ten years old, that there was no physical evidence against Garcia, and that there was conflict between the testimony of various witnesses.

¶26 The jury found Garcia guilty on all three charges. Garcia now appeals.

ISSUES AND STANDARD OF REVIEW

¶27 Garcia asserts three claims of ineffective assistance of counsel. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (cleaned up).

ANALYSIS

¶28 A criminal defendant is guaranteed the effective assistance of counsel under the Sixth Amendment to the United States Constitution. *See* U.S. Const. amend. VI ("In all criminal

prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."); *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) ("It has long been recognized that the right to counsel is the right to the effective assistance of counsel."). To secure reversal of a conviction under a claim of ineffective assistance of counsel, a defendant must satisfy the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

¶29 "First, the defendant must show that counsel's performance was deficient." *Id.* at 687. When applying this prong of the test, the reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (cleaned up).

¶30 "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. In other words, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

¶31 "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687. Moreover, because both showings are required, we need not "address both components of the [ineffective assistance] inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

## I. Unanimity Instruction

¶32 Garcia first argues that Counsel rendered ineffective assistance by not seeking a unanimity instruction on the aggravated sexual abuse charge. While this may have amounted

to deficient performance, we do not agree that it was prejudicial to Garcia under the facts of this case.

¶33 For a person to be convicted of aggravated sexual abuse of a child, the State must prove that under circumstances not amounting to rape, object rape, or sodomy on a child, or an attempt to commit one of those crimes, the person "touche[d] the anus, buttocks, pubic area, or genitalia of any child"; "touche[d] the breast of a female child"; or "otherwise [took] indecent liberties with a child" with the intent to "cause substantial emotional or bodily pain to any individual" or to "arouse or gratify the sexual desire of any individual." Utah Code § 76-5-404.1(2)(a).[4] The charges against Garcia included only one count of aggravated sexual abuse, yet evidence was presented of three different incidents, or types of incidents, that could have satisfied this charge: (1) Garcia's touching of Alicia's clitoris with his hand during the lotion game, (2) his touching of her vagina when he helped her off a roof, and (3) his touching of her vagina in the hotel swimming pool.

¶34 When, as here, a jury hears evidence of "more instances of alleged abuse than the State [has] charged," the unanimity requirement "is not met if [the] jury unanimously finds only that a defendant is guilty of a crime." *State v. Baugh*, 2022 UT App 3, ¶¶ 14, 16, 504 P.3d 171 (cleaned up), *cert. granted*, 525 P.3d 1257 (Utah July 11, 2022) (No. 20220272). Instead, "the jury must agree

---

4. The aggravating factor for this charge was met in this case by the particular familial relationship between Alicia and Garcia. *See* Utah Code § 76-5-404.3(2)(a)(viii) ("An actor commits aggravated sexual abuse of a child if, in conjunction with the offense described in Subsection 76-5-404.1(2)(a), . . . the actor occupied a position of special trust in relation to the child . . . ."); *id.* § 76-5-404.1(1)(a)(iv)(U) (defining a person in a "[p]osition of special trust" to include "an uncle"). Garcia does not challenge this aspect of his conviction.

on a specific criminal act for each charge in order to convict." *Id.* ¶ 14 (cleaned up). Thus, the purpose of a unanimity instruction is to convey to the jury the requirement that it "be unanimous as to the specific acts supporting each count of conviction." *Id.* ¶ 15 (cleaned up). And when the State does not identify for the jury "which act supported each charge, the jury should [be] instructed to agree on a specific criminal act for each charge in order to convict." *State v. Alires*, 2019 UT App 206, ¶ 22, 455 P.3d 636, *cert. denied*, 466 P.3d 1076 (Utah 2020).

¶35 Although during closing arguments the State linked the aggravated sexual abuse charge to Garcia's touching of Alicia's clitoris with his hand during the lotion game, the State did not consistently make that link during trial. And because that was just one of three incidents (or types of incidents) of aggravated sexual abuse for which evidence was presented at trial, Counsel's failure to request a unanimity instruction arguably amounted to deficient performance. *See id.* ¶¶ 23, 25 (recognizing that "[w]here neither the charges nor the elements instructions link each count to a particular act, instructing the jury that it must agree as to which criminal acts occurred is critical to ensuring unanimity on each element of each crime," and determining that under the facts of the case the "failure to request such an instruction fell below an objective standard of reasonableness"). Nevertheless, we are not convinced that under the circumstances of this case any such deficient performance was prejudicial to Garcia.

¶36 The jury convicted Garcia on the charge of rape of a child. The only activity supporting that charge—sexual intercourse during the lotion game—allegedly happened in conjunction with conduct that would have also supported the aggravated sexual abuse charge—Garcia's touching of Alicia's clitoris with his hand during the lotion game. We find it highly unlikely that the jury members who unanimously convicted Garcia of raping Alicia would not also have convicted him of aggravated sexual abuse based on the qualifying conduct that Alicia said occurred at the

same time as the rape. That is, we are incredulous that the jury that believed Alicia's account of Garcia putting the tip of his penis into her vagina during the lotion game incidents would not have also believed her assertion that Garcia put his fingers on top of her clitoris during the same incidents (or that it would not have believed that such touching was for purposes of sexual gratification). Therefore, we do not believe there is a reasonable probability that had Counsel requested a specific unanimity instruction, the outcome on this charge would have been any more favorable to Garcia. *Cf. State v. Naranjo*, 2023 UT App 131, ¶¶ 48–50, 538 P.3d 1278 (concluding, in a case where there were four alleged instances of a defendant's failure to stop at the command of a police officer, that failure to request a specific unanimity instruction was harmless because there was "no reasonable probability that members of the jury" did not agree that, at a minimum, the defendant must have seen the officer's "flashing lightbar" before "proceed[ing] to drive away"). Thus, Garcia has not shown prejudice, and this ineffective assistance claim fails.

## II. Detective's and Mother's Testimony

¶37 Garcia next asserts that he received ineffective assistance when Counsel failed to object to Detective's and Mother's testimony recounting Alicia's out-of-court statements to them about the incidents of abuse. Garcia contends that competent counsel would have concluded that this testimony was inadmissible hearsay or inadmissible under rule 403 of the Utah Rules of Evidence and, therefore, that competent counsel would have objected to it. *See generally* Utah R. Evid. 801(c) (defining the term "hearsay"); *id.* R. 802 ("Hearsay is not admissible except as provided by law or by these rules."); *id.* R. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

We conclude that even if Counsel's failure to object to this testimony amounted to deficient performance, it did not prejudice Garcia.

¶38    "[W]here testimony is merely cumulative, we are disinclined to find prejudice even when the testimony was improperly admitted." *State v. Jones*, 2020 UT App 31, ¶ 35, 462 P.3d 372; *see also State v. Thomas*, 777 P.2d 445, 450 (Utah 1989) ("We conclude that the trial court erred in allowing the officer to testify to the full content of the interview. In view of the fact, however, that the officer's testimony was merely cumulative to that already testified to by the victim, the error was harmless . . . ."); *State v. Soto*, 2022 UT App 107, ¶ 27, 518 P.3d 157 ("[T]here is no reasonable probability that the detective's repetition of [the victim's] statements altered the outcome because [the victim] testified at trial and recounted the same facts."), *cert. denied*, 526 P.3d 827 (Utah 2022). Garcia concedes that Detective's and Mother's recitations of Alicia's accusations against Garcia were cumulative of Alicia's own testimony. And we agree with the State that "Garcia makes no showing that the jury would have acquitted him on any count if only it had not heard the unsurprising news that [Alicia] disclosed these allegations to family members and the authorities before trial."

¶39    Citing cases from other states, Garcia asserts that the repetition through inadmissible hearsay of a properly admitted witness account "'unfairly enhance[s] the credibility of a witness' because a 'jury is more apt to believe something that is repeated'" (quoting *People v. Terry*, 728 N.E.2d 669, 678 (Ill. App. Ct. 2000)) and that "[w]hen the State's case depends virtually exclusively on the credibility of a witness, as in this case, the bolstering of the witness's credibility by prior consistent statements cannot be harmless error" (quoting *McCray v. State*, 716 A.2d 302, 308 (Md. Ct. Spec. App. 1998)). We acknowledge that some jurisdictions take a somewhat different view than we have of the potentially prejudicial effect of improperly admitted cumulative evidence.

But our disinclination to find prejudice when improperly admitted testimony is merely cumulative of other properly admitted evidence is longstanding, *see, e.g.*, *State v. Collier*, 736 P.2d 231, 233 (Utah 1987) (per curiam) (holding that there was no prejudice where improper testimony "was only cumulative of the evidence and testimony" of other witnesses), and, we believe, well founded. Garcia's citation of cases from other states does not persuade us otherwise.

¶40 Garcia also emphasizes that for the wrongful admission of cumulative testimony to not be prejudicial, the challenged testimony must be "cumulative of other *properly admitted evidence*," *Jones*, 2020 UT App 31, ¶ 35 (emphasis added), and he argues that because Alicia did not testify that she told Mother and Detective about the alleged abuse, Mother's and Detective's statements to the jury that Alicia had spoken to them about the abuse were not cumulative of other properly admitted evidence. In other words, Garcia attempts to draw a meaningful distinction for ineffective assistance purposes between Mother's and Detective's recitations to the jury of the fact that Alicia had spoken to them about the abuse and Mother's and Detective's recitations to the jury of what Alicia actually said about the abuse itself. We are not persuaded that this distinction makes any difference.

¶41 For one thing, reasonable defense counsel could have concluded that Detective's and Mother's statements that Alicia spoke to them about the abuse were not hearsay because they were not offered for their truth. Instead, reasonable defense counsel could have concluded that those statements were offered only to explain why Mother contacted the police and why Detective conducted an investigation. Moreover, even were we to conclude that Detective's and Mother's statements of the mere fact that Alicia disclosed the abuse to them were hearsay, we could not say that such testimony was prejudicial to Garcia. The fact that Alicia, a minor, had disclosed alleged abuse to a family member and, subsequently, to law enforcement is an essentially

inescapable inference that anyone would draw from the simple existence of the criminal case itself. Thus, the portion of Detective's and Mother's testimony that may not have been technically cumulative of other properly admitted evidence created only the slightest potential for prejudice. We are not convinced that without such testimony there is a reasonable probability that the result of the proceeding would have been any different. Therefore, Garcia has not shown prejudice, and this ineffective assistance claim fails.

### III. Expert's Testimony

¶42 Finally, Garcia asserts that Counsel rendered ineffective assistance in failing to object to two aspects of Expert's testimony: (1) her testimony identifying the reasons Alicia gave in her forensic interview for having delayed her disclosure of the abuse and (2) her testimony regarding the interview techniques employed in the forensic interview. We do not agree that failure to object to these lines of questioning constituted deficient performance.

#### A. Reasons for Delayed Disclosure

¶43 Garcia asserts that Expert's testimony relating statements made by Alicia during her forensic interview was hearsay that did not fall under any hearsay exception and that competent counsel would have objected to this testimony. However, even if Garcia is correct that Expert's statements relating Alicia's reasons for delaying her disclosure could have supported a successful hearsay objection, Counsel's failure to object still did not amount to deficient performance. A competent attorney could have reasonably concluded that any such objection, even if sustained, would have been an ultimately futile attempt to keep Alicia's reasons for delaying her disclosure from being presented to the jury. Had the objection been made and sustained, the State could have simply re-called Alicia to the stand and questioned her directly as to the reasons for her delayed disclosure. And

competent counsel could reasonably assume that Alicia's answers to such questioning would be largely similar to the answers she previously provided in her forensic interview. When faced with choosing between those reasons coming in via Expert or via Alicia, a competent attorney could reasonably opt to have those reasons come in through the clinical statements of a professional rather than through the likely more emotional explanations of an alleged child victim.

B.      Interview Techniques

¶44      Finally, Garcia points to Expert's rebuttal testimony regarding recall memory and argues that it was deficient performance for Counsel not to object to this testimony because such testimony "improperly invited the jury to draw inferences about [Alicia's] credibility based upon Expert's experience." Garcia is certainly correct that "a witness may not offer a direct opinion of another witness's truthfulness on a particular occasion." *State v. King*, 2010 UT App 396, ¶ 44, 248 P.3d 984 (cleaned up). He is also correct that Expert's testimony would have been improper if it had "invit[ed] the jury to draw inferences about [Alicia's] credibility based upon Expert's past experience with other cases and studies." *State v. Burnett*, 2018 UT App 80, ¶ 36, 427 P.3d 288 (cleaned up), *cert. denied*, 432 P.3d 1232 (Utah 2018). But we do not agree that Expert's rebuttal testimony clearly violated these rules such that it was deficient performance for Counsel not to have objected to it.

¶45      As Garcia recognizes, Expert's rebuttal testimony did not evaluate any of Alicia's *responses* to the forensic interview questions but, rather, evaluated the types of questions that were *asked* during the interview. The focus was on what types of questions were asked and what type of memory each kind of question "tapped into." And while Expert did testify that recall memory is "more accurate" than recognition memory and that the vast majority of the questions in Alicia's forensic interview were

of the type that "tapped into recall memory," the inferred message was that the recall-oriented questions were less likely to influence or distort Alicia's memories, not that Alicia's answers necessarily relayed those memories accurately or truthfully. Competent counsel could have therefore concluded that this testimony did not amount to a direct opinion on Alicia's truthfulness and, accordingly, that an objection would have been futile.

¶46   In any event, the defense clearly opened the door to Expert's rebuttal testimony. "The idea of 'opening the door' is an evidentiary principle that allows the admission of otherwise inadmissible testimony to qualify, explain, or limit testimony or evidence previously admitted. This concept is based on considerations of fairness and the truth-seeking function of a trial." *UMIA Ins. v. Saltz*, 2022 UT 21, ¶ 63 n.10, 515 P.3d 406 (cleaned up). Here, the defense's witness had raised and discussed at length the potential creation of false memories and had specifically asserted that there was "a possibility of contamination" of Alicia's memory through the forensic interview questioning "even if [interviewers] used the FIT interview method." This opened the door for the State to present Expert's testimony in rebuttal focused on the type of questions used in Alicia's interview and the care taken to try to access accurate, uncontaminated memories.

¶47   Thus, because Expert's rebuttal testimony did not directly opine on the truthfulness of Alicia's interview responses, and because the defense had opened the door to rebuttal testimony about the interview's possible "contamination" of Alicia's responses, competent counsel could have reasonably determined that the rebuttal testimony was appropriate. Therefore, it was not deficient performance for Counsel not to have objected to this testimony, and Garcia's related ineffective assistance claim fails.

CONCLUSION

¶48     Even assuming deficient performance regarding the lack of a unanimity instruction and the admission of Detective's and Mother's challenged testimony, Garcia has failed to show that he was prejudiced by those alleged failures. And as to Garcia's arguments regarding components of Expert's testimony, he has not established that Counsel preformed deficiently. Accordingly, each of Garcia's claims of ineffective assistance of counsel fail, and we affirm.

—————